[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 7, 2011
JOHN LEY
CLERK

_____

No. 09-16315

_____

D. C. Docket No. 08-01219-CV-T-24-MAP

PATSY CROOM,

Plaintiff-Appellant,

versus

WILLIAM F. BALKWILL,
Sheriff, in his individual and
official capacities,
CLIFFORD LEGG,
SCSO Sergeant, in his individual
and official capacities,
FRANK BYBEE,
SCSO Detective, in his individual
and official capacities,
STEPHANIE GRAHAM,
SCSO Deputy, in her individual and
official capacities,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(July 7, 2011)


Before TJOFLAT, WILSON and RIPPLE,[*] Circuit Judges.

PER CURIAM:

On August 20, 2004, Patsy Croom was seized by law enforcement and detained for up to two hours while officers[1] searched the residence of her son. Croom argues the officers' actions violated her rights under the Fourth Amendment. The district court granted summary judgment in favor of the defendants, and Croom appeals.

I.

In August of 2004, Croom, a 63-year old retiree and Arkansas resident, came to Sarasota, Florida to visit her son whose wife had recently committed suicide.[2]

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] The law enforcement team conducting the search and seizure in question was comprised of federal and state actors. For convenience, we will sometimes refer to the law enforcement officials generically as "officers."

[2] As this is an appeal from a grant of summary judgment, we construe all disputed facts in the light most favorable to the non-movant below: Croom. See Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010).

On the day in question, Croom was gardening in the front yard of her son's home ("the Premises"), wearing only a one-piece bathing suit. It was a sunny day; her son was at work; and Croom "bounced back and forth" between the house and the yard, cooking, sunning herself, and watering the plants. Her son's friend, Tashko Dinev, was sleeping inside. The appellees ("defendants"), meanwhile, were preparing to search the Premises.

In June 2004, a confidential informant alerted the Sarasota County Sheriff's Office that three men, including Croom's son and Dinev, were selling ketamine[3] out of two local residences—one of which was the Premises. After conducting some background investigation,[4] officers intercepted a package from Bulgaria being shipped to the Premises containing thirty-five vials of ketamine.

Detective Frank Bybee, the defendant in charge of the investigation, obtained an anticipatory search warrant for the Premises and arranged for a controlled delivery of the package. The validity of the warrant was conditioned upon the receipt of the package by an occupant of the premises. Bybee classified

---

[3] Ketamine is a Schedule III narcotic, 21 C.F.R. § 1308.13(c)(7), primarily used to anesthetize animals, but also sold illegally for recreational use. It can be used as a "date-rape" drug. Street names for ketamine include "K," "Special K," and "Vitamin K."

[4] For example, defendant Frank Bybee, the lead detective on the case, discovered ten empty ketamine bottles discarded at the other residence in question. Additionally, Bybee secured a statement from the third suspect indicating that he had received ketamine from Dinev and Croom's son and that Dinev received ketamine in shipments from Bulgaria.

the warrant as "high hazard," pursuant to Sheriff's Office policy, because the search was for narcotics and required entry into a house. Law enforcement personnel were divided into two teams: a entry/search team and a perimeter team. After rehearsing the execution of the warrant, the teams departed for the Premises on the afternoon of August 20th in separate, unmarked vehicles.

Sometime between 3:00 and 4:00 p.m., United States Postal Inspector John Crockett, dressed as an ordinary mailman and wearing a one-way transmitter,[5] approached the Premises with the package. He met Croom in the front yard, and Crockett asked her if she knew "Mr. Nicola Hristov," the addressee of the package. Croom told Crockett that she did not, because she was just visiting her son and was not from the area. The two conversed for five or more minutes, talking about the weather, the tragic reason for Croom's visit, as well as her various medical issues.[6] The conversation culminated with Crockett asking Croom if she could sign for the package. She did, took the package inside, left it unopened on a computer table, and returned outside to resume watering the plants. Crockett testified during his deposition that Croom "didn't seem to pose any risk at all." Deposition of

[5] The transmitter allowed Bybee to hear any conversation that took place between Crockett and others.

[6] Apparently, Crockett "indicated that is was awfully hot for [Croom] to be out sunning." Appellant's Brief at 11. Crockett responded that the heat made some of her medical issues "feel better." Id. She informed Crockett she had rheumatoid arthritis and had had many surgeries, including various joint replacements. Id. at 11–12.

4

Crockett at 44.

The package was equipped with a sensor to alert law enforcement when it had been opened. Law enforcement waited for approximately thirty minutes for a signal from the sensor. When none came, defendant Sergeant Clifford Legg decided to proceed with the warrant's execution.

Croom was seated on a "timber" when people wearing masks, dressed in black, and carrying guns ran up screaming for her to "hit the ground." Appellant's Brief at 13. She was approached by a female member of the group,[7] whom she told, "I'm getting down as fast as I can. I've got arthritis. I can't get down on the ground." Id. The female, Deputy Graham, kept yelling at Croom to get down. When Croom was unable to comply, Graham pushed Croom from a squatting position to the ground. Id. at 14. Graham then placed a foot on Croom's back, and Croom heard a gun "click." Croom Deposition at 88. Graham told her to "shut [her] mouth" when Croom tried to ask questions.[8] Croom was detained on the ground for up to ten minutes.

Eventually, Croom was ordered to "get up." She was unable, and defendant Graham and two others had to help her to her feet. Croom was brought into the

---

[7] Defendant Deputy Stephanie Graham was the only female officer on the scene.

[8] Croom claims the officers failed to identify themselves as law enforcement. In fact, while on the ground, Croom asked an officer if they were "terrorists" and if they were going to kill her. Appellant's Brief at 13–14.

house. It was only at this juncture that Croom learned that her detainors were law enforcement personnel.

At some point during this period, the officers woke Dinev. He promptly admitted to importing and distributing the ketamine, was arrested, and was removed from the scene.

Croom was detained for up to two hours while the officers conducted their search of the property. Initially, she was placed on the couch and given a glass of water. At some point she was moved to the dining room table. Although each defendant's deposition testimony varies somewhat, it seems clear that the defendants ceased harboring any suspicions that Croom was involved in the criminal activity after they spoke with both her and Dinev.

In the wake of the incident, Croom alleges she suffered medical problems caused by the manner of her seizure and detention by the defendants.

## II.

Croom argues that the district erred by granting defendants' motions for summary judgment. We review a district court's grant of summary judgment <u>de novo</u>, viewing the factual allegations in the light most favorable to the non-movant below. <u>Penley v. Eslinger</u>, 605 F.3d 843, 848 (11th Cir. 2010).

## A.

It is undisputed that the defendants are law enforcement officers who were acting in their official capacities at the time of the incident. Consequently, the defendants enjoy a qualified immunity from suit that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). In order to find the defendants susceptible to suit, we must first answer two questions in the affirmative. One, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer[s'] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001), modified, Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009) (holding that courts need not address Saucier's two prongs in sequential order). And two, was that right "clearly established"? Saucier, 533 U.S. at 201. Meaning, based on the facts alleged, "would [it have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted"? Id. at 202.

The district court answered the first question in the negative, concluding that the facts alleged by Croom, even if proven to be true, did not establish a Fourth Amendment violation. Though we are sympathetic to Croom's plight and

7

frustration, after careful consideration, we must agree.[9]

B.

The Fourth Amendment protects "the people" from "unreasonable searches and seizures." U.S. Const. amend. IV.[10] In this case, the Fourth Amendment "event" at issue—i.e., the state action triggering the amendment's protection—is Croom's extended seizure by law enforcement. See Michigan v. Summers, 452 U.S. 692, 696 n.5, 101 S. Ct. 2587 (1981) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." (quoting Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868 (1968) (internal quotation marks omitted)); Brower v. County of Inyo, 489 U.S. 593, 597, 109 S. Ct. 1378 (1989) (holding that a Fourth Amendment "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied" (emphasis omitted)).

Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime, see Summers, 452 U.S. at 696, 699–700; Dunaway v. New

---

[9] We reach the same result as the district court; however, we do so for slightly different reasons.

[10] One's rights under the Fourth Amendment were extended to protect against state, as opposed to federal, action by the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684 (1961).

8

York, 442 U.S. 200, 209–16, 99 S. Ct. 2248 (1979); Henry v. United States, 361 U.S. 98, 101–03, 80 S. Ct. 168, 170 (1959).  However, beginning with Terry v. Ohio, the Supreme Court has recognized that certain types of limited detentions—i.e. seizures lacking the essential attributes of full, custodial arrests—may be constitutional even in the absence of probable cause.  Terry, 362 U.S. at 20; see United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637 ("The exception to the probable-cause requirement for limited seizures of the person recognized in Terry and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of the Fourth Amendment's general proscription against unreasonable searches and seizures." (internal quotation marks omitted)).  In such cases, the Court has "balance[d] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Id.  And, "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."  Id.

This case involves one such class of seizures: temporary detentions by law enforcement of a premises' occupants while those premises are being searched

pursuant to a search warrant.  See Summers, 452 U.S. at 705 (holding that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted" (footnote omitted)); Muehler v. Mena, 544 U.S. 93, 100–02, 125 S. Ct. 1465 (2005) (holding law enforcement acted reasonably by detaining non-suspect occupant of residence in handcuffs for up to three hours).

In Summers, the Supreme Court considered whether it was lawful for law enforcement officers executing a warrant on Summers's residence to seize him on the sidewalk outside his house, require him to re-enter the home, and detain him therein during the course of the search.  452 U.S. at 693–94.  Weighing the "character of the official intrusion and its justification," the Court determined that a temporary detention incident to a validly issued search warrant did not run afoul the Fourth Amendment.  Id. at 701–05.

Of paramount importance to the Court was the fact that a detached and neutral magistrate had found probable cause to search the home.  Id. at 701.  Given that constitutionally authorized intrusion into Summers's privacy, the Court determined the additional imposition caused by his seizure, while substantial, "was

surely less intrusive than the search itself." Id.[11] The Court then balanced that "incremental intrusion" against three important governmental interests advanced by the authority to temporarily detain occupants of premises during its search: (1) flight prevention; (2) the minimization of risk to officers; and (3) the facilitation of an orderly search. Id. at 702–03; Mena, 544 U.S. at 98. Finally, the Court relied on the fact that the warrant provided an "objective justification for the detention." Summers, 452 U.S. at 703. The existence of a warrant established that "the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home" had been made by a neutral magistrate; and the "connection" between the occupant and property gave law enforcement "an easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d] a detention of [the] occupant." Id. at 703–04. Thus, the Court determined that detentions such as Summers's were authorized by the Fourth Amendment. Id. at 705.

Importantly, though its decision in Summers was driven by a careful balancing of factors and facts, the Court clarified that their rule thus established did not call for a repetition of that balancing in each of its applications. Id. at 705 n.19.

---

[11] Additionally, the Court noted that Summers was detained in his home—a private setting where most people in his situation would elect to remain during a search of their belongings, and one that "could add only minimally to the public stigma associated with the search itself . . . ." Summers, 452 U.S. at 701–02.

11

To the contrary, the Court recognized that, "if police are to have workable rules, the balancing of the competing interests inherent in the Terry principle 'must in large part be done on a categorical basis—not an ad hoc, case-by-case fashion by individual police officers.'" Id. (quoting Dunaway, 442 U.S. at 219–20 (White, J., concurring)). The Court therefore stated that, "[t]he rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." Id. (emphasis added).[12]

In Mena, the Court confirmed that Summers had established a categorical rule. Mena, 544 U.S. at 98. There, the Court reviewed a decision by the Ninth Circuit that police officers violated Mena's Fourth Amendment rights by detaining her, handcuffed, for three hours during a warranted search of her residence. Id. at 95–97. Mena was an innocent bystander, and the Ninth Circuit ruled that law enforcement was not entitled to continue detaining her after "it became clear to officers that she posed no immediate threat." Mena, 544 U.S. at 97 (citing Mena v.

---

[12] This language stands in stark contrast to most Reasonableness Clause cases, where the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417 (1996).

    The Court did acknowledge, however, that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case . . . ." Summers, 452 U.S. at 705 n.21.

City of Simi Valley, 332 F.3d 1255, 1263 (9th Cir. 2003)). The Supreme Court

disagreed, describing Summers as having established a "categorical" rule that

justified "Mena's detention for the duration of the search . . . because a warrant

existed to search [the premises] and she was an occupant of that address at the time

of the search." Id. at 98.

It is through this lens that we must analyze Croom's claim.

### III.

Our analysis of Croom's Fourth Amendment challenge breaks naturally into

three pieces: (1) Was her seizure lawful at its inception? (2) Was it lawful in its

scope and duration? (3) And, finally, was it lawful in its manner?—to wit, was the

force used to effect the seizure lawful? We address each question in turn.

### A. *The Initial Detention*

Croom argues that her initial seizure was unconstitutional because of defects

in the warrant. For example, she argues that the warrant provided only the

authority "to search the [Premises], and all persons found therein who are

reasonably believed to be involved in the criminal activity, as well as any vehicles

or any detached structures that are within the curtilage of the property . . . ";

however, she was seized in the non-curtilage front yard. Appellant's Brief at 24

(emphasis added). Or, the anticipatory warrant was conditioned on "the delivery of

13

[the] package by [sic] an <u>occupant *within* the residence</u>"; yet, the package was actually delivered to a <u>non-occupant</u> (Croom) *outside* the residence. <u>Id.</u> at 28–29 (original emphasis removed and new emphasis added).

These warrant-based arguments fail because they focus on the wrong Fourth Amendment event. <u>See</u> <u>Summers</u>, 452 U.S. at 695 n.4 (distinguishing between the constitutional issues of "search" versus "seizure" in the instant context). The officers' authority to detain Croom flowed not from the warrant, but rather from the Reasonableness Clause of the Fourth Amendment. <u>See id.</u> at 697–706 (looking to the "reasonableness standard embodied in the Fourth Amendment," as well as some recognized exceptions thereunder, to justify Summers's detention); <u>Mena</u>, 544 U.S. at 99 n.2 (rejecting the Court of Appeal's reliance on Mena's non-inclusion in the warrant description as a basis for finding a Fourth Amendment violation); <u>see</u> <u>also</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 611, 119 S. Ct. 1692 (1999) (citing temporary detentions under <u>Summers</u> as instances where law enforcement is authorized to act under the Fourth Amendment absent explicit authorization by the text of a warrant); <u>Unus v. Kane</u>, 565 F.3d 103, 120 n.23 (4th Cir. 2009). Croom's seizure was certainly incident to the search of the Premises, but it was a distinct Fourth Amendment event.

The essence of Croom's argument is captured by this claim from her brief:

14

"Because the condition precedent/triggering event never occurred, the search warrant was rendered a legal nullity, and all law enforcement activity related to the warrant was unauthorized, illegal, and clearly unconstitutional." Appellant's Brief at 31. This is simply an mistaken interpretation of constitutional law.

When evaluating a limited seizure under an exception to the probable-cause requirement, we look to the "objective reasonableness" of the law enforcement officer's actions, asking: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. at 21–22 (footnote omitted). Cf. Michigan v. Long, 463 U.S. 1032, 1051, 103 S. Ct. 3469 (1983) ("In evaluating the validity of an officer's investigative or protective conduct under Terry, the '[t]ouchstone of our analysis . . . is always the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security.'" (quoting Pennsylvania v. Mimms, 434 U.S. 106, 108–09, 98 S. Ct. 330 (1977)) (internal quotation marks omitted)).

Croom is quite correct that the Supreme Court's analysis in Summers relied heavily on the existence of a valid warrant. See Summers, 452 U.S. at 703 ("We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid

15

warrant."). However, in analyzing the constitutionality of Croom's seizure, our concern is simply whether the actions taken by the officers were objectively reasonable in light of the facts known to them at the time. See Terry, 392 U.S. at 22. Therefore, so long as the warrant and its execution were sufficient to justify the reliance of an objectively reasonable officer in the defendants' positions, any technical defect in its execution is irrelevant. Cf. Maryland v. Garrison, 480 U.S. 79, 85–86, 107 S. Ct. 1013 (1987) (concluding Garrison's Fourth Amendment rights were not violated when law enforcement erroneously and illegally searched his apartment while executing a search warrant later discovered to be overbroad, because the mistake was reasonable in light of the information known to the officers at the time).[13]

In light of the clear and categorical rule laid down in Summers, as reinforced by its application Mena, we conclude Croom's initial seizure was plainly constitutional. The defendants possessed an anticipatory search warrant to search the Premises for contraband conditioned upon the delivery of the package of ketamine to an occupant within the residence.[14] Once that package was delivered

---

[13] We express no opinion as to whether there was, in fact, any such defect in the warrant or its execution.

[14] We find no merit in Croom's argument that she did not "occupy" the premises at the time of her seizure. See United States v. Fountain, 2 F.3d 656, 663 (6th Cir. 1993) (holding that Summers "occupants" include non-residents present at scene), overruled on other grounds, Trepel v. Roadway Express, Inc., 194 F.3d 708, 717 (6th Cir. 1999). At the time the warrant was

16

to Croom and taken inside the home, "reasonably prudent men" in the defendants' positions would have been "warranted in the belief" that they were validly authorized to execute the warrant and search the Premises. Implicit in that authority is the categorical right to temporarily detain occupants of the Premises. See Mena, 544 U.S. at 99 n.2 ("Summers makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.'" (quoting 452 U.S. at 703–04)). Therefore, Croom's initial detention was constitutional.

### B. *Scope and Duration*

Our constitutional inquiry does not end there. When dealing with limited seizures not subject to the probable-cause requirement, a seizure that is reasonable at its inception may quickly become underreasonable if it extends beyond its unique justification. See Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319 (1983)

---

executed, she had been residing with her son for nearly a week. By her own admission, on the afternoon in question, she was "bouncing back and forth" between the house and the yard. As noted at oral argument, notwithstanding the conceptual flaw in her argument explained above, the very fact she believes she has standing to challenge the legality of the search of the Premises belies any notion she was not, in fact, connected to the property. Cf. Minnesota v. Olson, 495 U.S. 91 (1990) (stating that one's "status as an overnight guest is alone enough to show that [one has] an expectation of privacy in the home that society is prepared to recognize as reasonable").

Additionally, we find no constitutional significance in the fact that Croom accepted the package in the yard and carried it into the house herself, as opposed to being handed it while she was physically within the structure.

(plurality opinion) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Croom thus argues that, even if her detention was constitutional at the outset, it ceased to be so once law enforcement concluded she posed no threat and was not involved in the crime. We disagree.

Summers itself was less than explicit regarding the outer bounds of police authority to detain occupants of a premises during a warranted search, including the permissible length of Summers detentions. A fair reading of that opinion, however, implies that law enforcement officers are entitled to detain occupants of a premises for the whole length of most warranted searches. See Summers, 452 U.S. at 705 n.21 (acknowledging possible exceptions to the Summers rule for "special circumstances" and "prolonged detention[s]," implying that the general rule of "routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant" confers the power to detain occupants for the length of such "routine" searches); id. at 701 n.14 (acknowledging Professor LaFave's view that police diligence is important to evaluating a seizure's "reasonableness"). Moreover, in Mena, the Court clearly assumed as much, rejecting the Ninth Circuit's holding (and Croom's argument here) that an innocent detainee must be released once officers cease suspecting him or her of wrongdoing.

18

<u>Mena</u>, 544 U.S. at 98 ("Mena's detention <u>for the duration of the search</u> was reasonable under <u>Summers</u> because a warrant existed to search [the premises] and she was an occupant of that address at the time of the search." (emphasis added)). As a result, we must conclude that—at the very least—<u>Summers</u> permits the continued detention of lawfully detained occupants of a premises during the length of a routine and diligently pursued warranted search thereof.

On the facts of this case, we hold the scope and duration of Croom's detention was constitutional. After being fully restrained for up to ten minutes while the house was being secured, Croom was transferred to the couch (and then the dining room table), where she remained—unrestrained—for up to two hours. In light of the three-hour detention of an innocent bystander deemed "plainly permissible" by the Supreme Court in <u>Mena</u>, <u>id.</u>, we cannot conclude that Croom's seizure here became unconstitutional over time.[15]

_____

[15] Croom repeatedly argues that, in reaching the same conclusion, the district court failed to actually construe the disputed facts in her favor. To the extent the court below committed such error, it did so because it erroneously analyzed Croom's seizure as a traditional "investigative stop" under <u>Terry</u>. It was not. <u>Summers</u> was not simply a routine application of <u>Terry</u>, but rather the establishment of a distinct and categorical exception to the probable-cause requirement supported by the Reasonableness Clause. Were this a traditional <u>Terry</u> investigative stop, Croom would be correct that her detention would have been required to cease once law enforcement's reasonable, articulable suspicions of her were allayed. <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 500, 103 S. Ct. 1319 (1983) (plurality opinion) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Any lack of precision in the court's factual treatment was born from its struggle to apply the clear mandate of <u>Summers</u> alongside a body of (largely irreconcilable) <u>Terry</u> cases. <u>See, e.g.,</u> district court's Order on Motion to Strike Affidavit Filed in Support to Motion for Summary Judgement, and on Motions for Summary Judgement at 22 (citing <u>United States v. Acosta</u>, 363 F.3d 1141, 1144–45

## C. *Force*

Croom also argues that the defendants used excessive force to effect her seizure. In short, Croom argues that—because she is an elderly woman, who at the time of the seizure was wearing only a one-piece bathing suit and was known by the officers to be infirm—any use of force whatsoever, however small, was objectively unreasonable.

"Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Mena, 544 U.S. at 98–99. Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard, judging the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene . . . ." Graham v. Connor, 490 U.S. 386, 395–96, 109 S. Ct. 1865 (1989). Generally, such claims require "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v.

_____

(11th Cir. 2004) for the proposition that, "Whether an officer's actions were justified at the inception 'turns on whether the officers had a reasonable suspicion that [Croom] had engaged, or was about to engage, in a crime.'"); id. at 24–30 (applying Acosta's four-part test for investigatory detentions).

    Furthermore, like the Supreme Court in Summers, we find nothing persuading us that this was not a "routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant . . . ." 452 U.S. at 705 n.21. Therefore, the potential exceptions to the Summers rule for "special circumstances" or "prolonged detentions" referred to in that opinion's footnote twenty-one are not implicated here. See note 12, supra.

Garner, 471 U.S. 1, 8, 105 S. Ct 1694 (1985)) (internal quotation marks omitted).[16]

However, our Circuit has long declined to entertain claims of excessive force predicated upon the use of de minimus force by law enforcement. See Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."); id. at 1258 (holding that the de minimus force exception survived Graham).

Though we are skeptical that the force alleged was truly necessary under the circumstances, we cannot find a constitutional violation based on its usage. Even if unnecessary, the force used against Croom was de minimus. In light of the holding of Nolin, we must affirm the district court's grant of summary judgment on this claim. We note, however, that the de minimus-force exception preserved by Nolin in the wake of Graham may not sweep as broadly as it once did. See Hope v. Pelzer, 536 U.S. 730, 739 & n.9 (2002) (rejecting this Circuit's "rigid gloss" on the qualified immunity standard represented by cases such as Suissa v. Fulton Cnty., 74 F.3d 266–70 (11th Cir. 1996) (per curiam); Lassiter v. Alabama A & M Univ. Bd. of Trs., 28 F.3d 1146, 1150 (11th Cir. 1994); Hill v. Dekalb Reg'l

---

[16] "[P]roper application" of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

21

Youth Det. Ctr., 40 F.3d 1176, 1185 (11th Cir. 1994)—cases representing doctrine

relied upon by this Court in its Nolin decision); Holloman ex rel. Holloman v.

Harland, 370 F.3d 1252, 1277–78 (11th Cir. 2004) (recognizing the impact of

Hope on this Circuit's doctrine).

The force here at issue consists of Deputy Graham pushing Croom to the

ground from her squatting position and holding her there with a foot (or knee) in

the back for up to ten minutes.[17]  "Summers itself stressed that the risk of harm to

officers and occupants is minimized 'if the officers routinely exercise unquestioned

command of the situation.'"  Mena, 544 U.S. at 99 (citing Summers, 452 U.S. at

---

[17]  Croom's belief that she heard a gun "click" at the beginning of her detention does not change our analysis.  An officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force.  See, e.g., Petta v. Rivera, 143 F.3d 895, 905 (5th Cir. 1998) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him.") (citation omitted); Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc) (agreeing with the Fifth Circuit's analysis in Petta); McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir. 1992) (denying qualified immunity for officer who held his gun to the head of a nine year-old boy who neither threatened danger to the officer nor was attempting to flee or evade the officer during a valid search of a residence); Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) ("While it may have been reasonable for Kading to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on [an] infant, as he was alleged to have done, falls outside the Fourth Amendment's objective reasonableness standard.").  However, Croom has made no allegations similar to those made in these cases.

As recounted by Croom in her deposition, the facts show only that Croom heard a "click" that she believed to be a gun at the beginning of her seizure.  That Graham may have possessed a drawn weapon while approaching the Premises to serve a warrant and known drug location is not objectively unreasonable.  Croom does not allege that the weapon was, in fact, pointed at her at any time.  Additionally, she does not allege that the defendants used their weapons in a threatening manner at any time after the house was secured.  Consequently, even assuming the "click" heard by Croom was made by Graham's weapon, without some further indication of misconduct, that fact does not bolster her excessive force claim.

22

703).  Croom was in the front yard of a house known by law enforcement to be involved in the distribution of controlled substances at the time it was searched pursuant to a warrant.  See United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995) ("Guns and violence go hand-in-hand with illegal drug operations.").  For the safety of everyone involved—including Croom— the officers were authorized to exercise "unquestioned command of the situation" by placing all the occupants of the Premises on the ground for several minutes while securing the home and ensuring there was no danger to the officers or the public.  Once the Premises had been secured, Croom was subjected to no further exercise of force during her detention.  Consequently, we hold the force used here by law enforcement was de minimus, and Croom's Fourth Amendment right to be free from excessive force at the hands of law enforcement was not violated.

## IV.

Because the facts alleged by Croom would fail to establish a Fourth Amendment violation even if they were proven to be true at trial, we affirm the judgment of the district court in its entirety.[18]

---

[18]  Croom also appeals the district court's denial of her motion to strike defendant Graham's affidavit that was filed in support of Graham's motion for summary judgment. Claiming Graham's averments in her affidavit contradict her deposition testimony, Croom argues the district court abused its discretion by failing to strike it from the record.  See Van T. Junkins & Assocs. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely

23

AFFIRMED.

---

contradicts, without explanation, previously given clear testimony.").

Having reviewed the district court's ruling, we conclude it did not abuse its discretion in determining that the inconsistencies between Graham's affidavit and her deposition were more appropriately considered "variations of testimony" or "instances of failed memory" going to the weight and credibility of the evidence, as opposed to falsehoods rendering the affidavit a disregardable "sham."  See Tippens v. Celotex Corp., 805 F.2d 949, 953–55 (11th Cir. 1986) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.").