[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14546
Non-Argument Calendar
_____

D. C. Docket No. 1:11-cv-01182-RBP-HGD

J.B.,
A minor, who sues by and through his
Mother and next friend, Stacy Brown,

Plaintiff-Appellant,

versus

SHERIFF LARRY AMERSON,
in his official and individual capacities,
DEPUTY WARD,
in his official and individual capacities,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 28, 2013)

Before DUBINA, Chief Judge, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant J.B., by and through his mother and next friend, Stacy Brown ("Stacy"), appeals the district court's order granting summary judgment in favor of Defendant-Appellee Sheriff Larry Amerson ("Amerson") on J.B.'s Fourth Amendment excessive force claim. After reviewing the record and reading the parties' briefs, we affirm.

## I.

*Facts*

In February 2011, J.B., then 14 years old, was suspended from an alternative school program. Stacy elected to send her son to a Calhoun County Jail program for suspended students which allowed J.B. to perform community service in lieu of being sent to the Department of Youth Services. After Stacy consented to J.B.'s participation in the program and dropped him off for the day at the jail, J.B. changed into a jail uniform and was given an assignment to clean walls with a toothbrush. Later in the day, jail personnel took J.B. and another program participant on a tour of the jail. J.B. alleges that during and after the tour, officers threatened and intimidated him, including threatening to lock him in a room alone with an inmate. Amerson claims to be without knowledge of these events, and former defendant Corrections Officer Wendell Ward ("Ward") denies these allegations. According to several of Amerson's officers, after J.B.'s cleaning

2

assignment, J.B. disobeyed their instructions, aggressively resisted them, cursed them, threatened to fight them, threatened to sue them, and struck an officer on the arm. J.B. and Stacy allege that J.B. was scared of his environment and wanted to call Stacy to come pick him up from the program.

According to Amerson, as a result of J.B.'s demeanor, his officers had to loosely handcuff and later shackle J.B. to a bench in a room used for fingerprinting. After an officer informed Amerson about their dealings with J.B., Amerson came in to talk with J.B. in an attempt to reason with him. The events of Amerson's interaction with J.B. are recorded on video, but there is no audio. The video shows Amerson sitting down next to J.B, who does not resist Amerson. At times, Amerson leans toward J.B. or put his arm around him. As J.B. acknowledges, Amerson told J.B. that Amerson was there to help him. But suddenly, after J.B. turned his head and body away from Amerson, Amerson grabbed J.B.'s shoulder, quickly turned J.B. back toward Amerson, and then stood over J.B. applying a choke hold for about 19–20 seconds.

Amerson claims that when J.B. turned away from him, he heard J.B. "hocking,"[1] as though he were about to spit at Amerson. Amerson explains that in

---

[1] The verb "hock" is not defined in dictionaries as Amerson uses the word. Amerson's use of "hock" is slang, and we understand him to mean that J.B. made the sound that a person would make when collecting phlegm in his throat before spitting it out. The word "hock" imitates the sound a person makes when "hocking."

order to prevent J.B. from spitting, Amerson stood up, turned J.B. around, grabbed J.B. by the jaw and neck, and told J.B. that he would not be spit upon.  J.B. denies that he "hocked" or tried to spit on Amerson and complains that Amerson choked him for no reason, inflicting pain and causing temporary shortness of breath and bruising.

After releasing J.B. from the choke hold, Amerson continued to try to counsel J.B. but was unsuccessful.  At some point, Amerson momentarily grabbed J.B. again by the shoulders as J.B. resisted him.[2]  Officers removed J.B.'s handcuffs and moved him to another room, where J.B. used furniture to crack a window, overturned a table, and ripped wiring from a wall.  J.B. explains that he believed the officers would place inmates in the room with him.  Amerson charged J.B. with criminal mischief and harassment.  J.B. was transferred to Coosa Valley Youth Services where he complained about his treatment at the jail, and Youth

_____

[2] The second amended complaint alleges vaguely that after grabbing J.B. by the neck, Amerson "assaulted J.B. a second time." [R. 21 at 5–6.]  Likewise, J.B.'s reply brief asserts that Amerson "assaulted J.B. *twice* without justification."  Reply Br. at 4 (emphasis added).  Yet J.B.'s response to the summary judgment motion, [*See* R. 73 at 5–6], and J.B.'s initial brief to this court, *see* Appellant's Br. at 6–7, describe only the choking incident in their statements of facts and neglect to discuss the second application of excessive force.  In his deposition, counsel asked J.B., "Do you remember if [Amerson] like grabbed you or strongly handled you in any other way besides the choking?"  J.B. responded that he could not remember.  [R. 75-2 at 16.]

We have reviewed the video of the second alleged application of force, [*see* R. 75 Exh. A], and we conclude that Amerson's momentary holding of J.B. by J.B.'s shoulders was *de minimis* and not actionable as a matter of law.  *See Scott v. Harris*, 550 U.S. 372, 378–81, 127 S. Ct. 1769, 1775–76 (2007) (holding that a court at summary judgment can and should view the facts in the light depicted by a video where there is no contention that a video fails to depict what actually happened).

Services officers photographed J.B.'s injury (bruising on his neck).[3] J.B. never received medical treatment for the physical injuries he claims to have suffered.

J.B. also claims to have suffered emotional and psychological trauma related to the incident, but he has refused therapy. Since the incidents at the jail, Stacy reports that J.B., who was diagnosed with ADHD and epilepsy before this incident, has been prescribed a new medication, Focalin. Stacy also testified that J.B.'s dosage of another medication, Seroquel, has been increased. Yet there is no evidence in the record explaining the purpose of either medicine or how J.B.'s need for the prescriptions is causally related to the events at issue in this case.

*Procedural History*

J.B. sued Amerson and Ward in federal court alleging several violations of his constitutional and statutory rights. Eventually, all claims were dismissed with prejudice except for J.B.'s 42 U.S.C. § 1983 excessive force claim against Amerson. J.B. maintained that the choking incident was an unreasonable and disproportionate use of force in light of J.B.'s young age, small stature, and subdued status at the time that Amerson grabbed him. After briefing and oral argument, which included the court's review of the relevant portions of the video and a photograph of J.B.'s bruise, the district court granted Amerson's motion for

---

[3] The district court found that "[e]ven a slight bruise cannot be truly perceived from an examination of the photograph." [R. 87 at 13.]

5

summary judgment, concluding that Amerson did not, as a matter of law, use excessive force in violation of J.B.'s constitutional rights because Amerson used *de minimis* force, as evidenced by J.B.'s *de minimis* injuries.  The court further found that even if a question of fact remained as to whether Amerson used excessive force, J.B. still could not defeat Amerson's defense of qualified immunity because J.B. failed to show that the law was clearly established that Amerson's use of force was excessive under the circumstances.  J.B. brought this timely appeal.

## II.

We review *de novo* the district court's grant of summary judgment, drawing all inferences and construing the evidence in the light most favorable to the non-moving party.  *Croom v. Balkwill*, 645 F.3d 1240, 1245 (11th Cir. 2011).[4] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  We may affirm the grant of summary judgment on the basis of any ground supported in the record.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001).

---

[4] J.B. argues in his initial brief that the district court's memorandum opinion improperly presumes and emphasizes Anderson's good will toward troubled youths in Calhoun County. Although the opinion does suggest that Amerson's program for suspended students like J.B. was a virtuous undertaking, that Amerson intended only to help, not hurt J.B., and that J.B. didn't care about Amerson's gestures of kindness, J.B.'s allegation of error is immaterial because we are reviewing his case *de novo*.

III.

After reviewing the parties' briefs, the district court's memorandum opinion, the transcript of the district court's hearing on the motion for summary judgment, and the most relevant evidence, i.e., the video, we hold that Amerson's conduct was objectively reasonable under the circumstances and that he is therefore entitled to qualified immunity.

*Qualified immunity*

Law enforcement officers like Amerson who act in their official capacities and within their discretionary authority enjoy qualified immunity from suit and are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Croom*, 645 F.3d at 1245 (internal quotation marks omitted). The Supreme Court has emphasized repeatedly "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (per curiam). To defeat Amerson's summary judgment motion and qualified immunity defense, J.B. must show that, (1) Anderson's conduct violated his constitutional right to be free from excessive force, and (2) his right was clearly established. *See Croom*, 645 F.3d at 1246. Where, as here, a plaintiff claims that a law enforcement officer has used excessive

7

force in the course of arresting or otherwise seizing him, we analyze his claim under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867–68 (1989).

*De minimis force*

A law enforcement officer's application of *de minimis* force to a lawfully arrested person is objectively reasonable. The district court concluded that J.B. could not prove a constitutional violation because J.B.'s *de minimis* injuries necessarily indicated a *de minimis* application of force. [*See.* R. 87 at 10 ("The undisputed evidence in this case establishes that the purported injury to the plaintiff was *de* minimis, if existent, *and thus*, that any force was *de minimis* and not excessive." (emphasis added)); *id.* at 16 ("This court concludes that there was no Constitutional violation because there was no excessive force; there was only *de minimis* physical or mental injury, if any injury.").] While we agree that there is scant evidence of J.B.'s physical or emotional injuries, we disagree with the district court that J.B.'s *de minimis* injury necessarily demonstrates that Amerson applied *de minimis* force.[5]

---

[5] J.B. similarly asserts that "[w]hether J.B.'s injuries were *de minim[i]s* is not dispositive." Appellant's Br. at 27. In support of his position, J.B. primarily discusses two Supreme Court cases on excessive force in the Eighth Amendment context. J.B. relies on these cases to demonstrate that the relatively minor nature of a plaintiff's injuries does not require a court to conclude that a defendant has not used excessive force. We agree with J.B. that *de minimis* injuries are not necessarily dispositive of an excessive force claim, but we arrive at that

It is well-settled that the use of *de minimis* force, "without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). *But see Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (explaining that *de minimis* force is actionable where a defendant is not legally entitled to seize the plaintiff).[6] Numerous cases from this court provide examples of what sort of force is, as a matter of law, *de minimis*, and therefore, lawful. *See, e.g.*, *Croom*, 645 F.3d at 1252–53 (11th Cir. 2011) (officer forced an unarmed, physically weak, elderly woman to the ground and held her there with a foot or knee on her back for ten minutes); *Nolin*, 207 F.3d at 1258, 1258 n.4 (officer shoved a 17-year-old male against a van, pushed a knee into his back, pushed his head against the van, searched his groin area in an uncomfortable manner, and handcuffed him); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559–60 (11th Cir. 1993) (officer unnecessarily pushed an already-handcuffed adult male into a wall). The district court observed that we have often discussed the minimal nature of the plaintiff's injuries in conjunction with a defendant's minimal use of

---

conclusion differently.  The Eighth Amendment excessive force cases cited by J.B. do not control here.  *See Graham*, 490 U.S. at 394, 109 S. Ct. at 1870–71 (distinguishing between excessive force claims which arise under the Fourth Amendment's prohibition against unreasonable seizures and the Eighth Amendment's ban on cruel and unusual punishments, and requiring that "[t]he validity of [a plaintiff's] claim . . . be judged by reference to the specific constitutional standard which governs that right").

[6] J.B. has not alleged that he was unlawfully seized—only that he was unreasonably subjected to excessive force.

9

force. *See, e.g.*, *Nolin*, 207 F.3d at 1258 n.4. (noting that the defendant's actions caused only "minor bruising which quickly disappeared without treatment" and reasoning that "a minimal amount of force and injury . . .will not defeat an officer's qualified immunity"); *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (per curiam) (finding defendant's entitlement to qualified immunity and reasoning that "[t]he minor nature of [plaintiff's] injury reflects that minimal force was used"); *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1460 (11th Cir. 1997) (finding defendant's entitlement to qualified immunity and reasoning that "the actual force used and the injury inflicted were both minor in nature").

Yet the *de minimis* nature of a plaintiff's injury does not foreclose the possibility of his entitlement to relief. *See, e.g.*, *Slicker v. Jackson*, 215 F.3d 1225, 1231–32 (11th Cir. 2000) ("[A] § 1983 plaintiff alleging excessive use of force is entitled to nominal damages even if he fails to present evidence of compensable injury.") Similarly, the *de minimis* nature of an injury does not require the legal conclusion that a defendant used non-actionable, *de minimis* force. In *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), we reasoned as follows:

> that [the plaintiff] did not suffer greater injury to her head as a result of it being slammed against the trunk of a car does not alone render the force used *de minimis*. . . . [O]bjectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm.

10

*Id.* at 1200.  Following the same logic, the fact that J.B. did not need or obtain

medical or psychological treatment after Amerson applied a choke hold does not

mean that Amerson applied *de minimis* force as a matter of law.[7]  Consequently,

we reject the district court's decision to grant summary judgment on the basis of *de*

*minimis* force.  However, this does not end our inquiry of whether J.B. has shown

that Amerson violated his right to be free from excessive force.

*Objectively reasonable force*

The objectively reasonable application of force is permissible under the

Fourth Amendment.  The application of *Graham*'s objective reasonableness

standard "requires careful attention to the facts and circumstances of each

particular case."  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872.  We must judge the

reasonableness of an officer's use of force from the perspective of a reasonable

officer engaged in the incident, rather than from the perspective of hindsight,

understanding that officers often must make "split-second judgments" in "tense,

uncertain, and rapidly evolving" situations.  *Id.* at 396–97, 109 S. Ct. at 1872.

---

[7] It is telling that the district court was unwilling to conclude, based on its viewing of the choke hold video, that Amerson applied *de minimis* force as a matter of law.  *See Myers v. Bowman*, ___ F.3d ___, 2013 WL 1442055 at *6 (11th Cir. 2013) (citing *Scott*, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8 (2007) for the proposition that a video can be used to establish that an officer's use of force was *de minimis* and lawful).  Instead of concluding that the choke hold itself constituted *de minimis* force, however, the district court focused on J.B.'s weak evidence of actual injury to reach its conclusion on *de minimis* force.

11

Because we apply an objective standard, we do not consider an officer's "underlying intent or motivation," i.e., whether his intentions are evil or good. *Id.* at 397, 109 S. Ct. at 1872.

"*Graham* dictates unambiguously that the force used . . . must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198. Although it is necessary and reasonable for an officer to apply force in order to effectuate a lawful arrest, it may or may not be reasonable for an officer to apply force upon a person who is already arrested and secured in handcuffs. It just depends on the relevant facts and circumstances. *Compare id.* (denying qualified immunity for officer who, after subduing and handcuffing a compliant plaintiff, led her to the back of her car and slammed her head against the trunk), *with Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (per curiam) (upholding qualified immunity for officers who tased an already arrested and handcuffed plaintiff because one officer reasonably believed that the plaintiff intentionally sprayed blood at the officers from his broken nose when he spoke).

J.B. asserts that Amerson's application of force was unreasonable under the circumstances because, at the moment that Amerson grabbed J.B., J.B. posed no obvious threat to Amerson or others. But when we consider the totality of the

12

circumstances, i.e., J.B.'s undisputed lack of respect for the jail officers, his threats to them, and his demonstrated willingness to lash out at the them, we can safely say that it was reasonable for Amerson to believe that J.B. turned away and "hocked" with the intent to spit at Amerson. *See Post*, 7 F.3d at 1559 (explaining that we judge the reasonableness of force from the perspective of a reasonable officer on the scene). Furthermore, the nature and duration of the force that Amerson applied to J.B. (a 19–20 second choke hold) was not disproportionate to the perceived need for force, and as the district court thoroughly explained in its analysis, the injury inflicted upon J.B. was minimal. *See Lee*, 284 F.3d at 1198 (advising that we consider the following factors indicating reasonableness: the need for force, the proportionality of the force applied in relation to the need, and the extent of any injuries inflicted).

J.B. contends that the video contradicts Amerson's testimony about his belief that J.B. was going to spit at him, and thus, a genuine dispute of material fact remains, precluding summary judgment. Although we must view the facts in the light most favorable to J.B., we must also consider Amerson's conduct from the perspective of a reasonable officer at the scene. *See Zivojinovich*, 525 F.3d at 1073. If J.B. had not been belligerent prior to meeting Amerson, this would be a different case, and we would be inclined to agree with J.B; but unfortunately for

13

J.B., J.B.'s behavior at the jail leads us to view Amerson's application of the choke hold as an appropriate precaution against being spit upon.

Accordingly, we hold that Amerson's conduct was objectively reasonable under these circumstances, and therefore, J.B. suffered no constitutional violation. Because we conclude that there is no constitutional violation on this record, we need not discuss Amerson's contention that there was no clearly established law placing him on notice that his actions were unconstitutional.

IV.

Because J.B. fails to show that Amerson's conduct was objectively unreasonable under the circumstances, we affirm the district court's grant of summary judgment based on qualified immunity in favor of Amerson.

**AFFIRMED.**