Justin SHUFORD, Ryan Anisko, Andres de Jesus, and Devin Lunde, on behalf of themselves and all other similarly situated, Plaintiffs,

v.

R.L. "Butch" CONWAY, Sheriff of Gwinnett County, Georgia, Colonel Don Pinkard, Administrator of the Gwinnett County Jail, and Lt. Col. Carl Sims, Commander of the Rapid Response Team at the Gwinnett County Jail, Defendants.

CIVIL ACTION NO. 1:13-CV-2250-SCJ

United States District Court, N.D. Georgia, Atlanta Division.

Signed April 01, 2016

1198

Craig Thomas Jones, The Orlando Firm, P.C., Decatur, GA, LEAD ATTORNEY, John G. Cicala, Law Office of John G. Cicala, Jr., P.C., Grayson, GA, LEAD AT-TORNEY, Alison Reich Spiers, Alison Reich Speirs, LLC, Atlanta, GA, for Plaintiffs.

Angela C. Couch, Regina Benton Reid, Richard A. Carothers, Thomas M. Mitchell, Carothers & Mitchell, LLC, Buford, GA, Michael Van Stephens, II, Gwinnett County Law Department, Lawrenceville, GA, for Defendants.

## ORDER

HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE

This matter appears before the Court on Defendant Carl Sims's Motion for Summary Judgment (Doc. No. [94]) and Defendants R.L. "Butch" Conway's and Don Pinkard's Motion for Summary Judgment (Doc. No. [95]).

## I. FACTUAL BACKGROUND

The above-named Plaintiffs have filed a Complaint, as amended, alleging a Fourteenth Amendment Excessive Force claim against Defendants Carl Sims, R.L. Con-

way, and Don Pinkard, who are current (or former) officials at the Gwinnett County Jail. Doc. Nos. [1], [69]. Plaintiffs seek damages and injunctive relief.[1]

The Court derives the following material facts from the parties' submissions.[2]

During the applicable time period, each of the above-named Plaintiffs was a pretrial detainee (in the pre-admissions/admissions area) at the Gwinnett County Detention Center (hereinafter "Jail") and was subjected to the use of force (inclusive of being placed in four-point restraints) by the Gwinnett County Sheriff Department's Rapid Response Team (hereinafter "RRT").[3]

The Gwinnett County Sheriff's Department maintains a RRT at the Jail. The RRT is a highly-trained, specially-equipped unit that is utilized to resolve high-risk incidents at the Jail as well as to support other agencies and to assist in maintaining control and order within the Jail. The RRT members work a variety of posts and may be deployed for a variety of reasons, including but not limited to the following situations:

a. Any riot, disturbance, or other high-risk incident at the Jail;

b. Any barricaded person(s) or hostage situation at the Jail;

c. Facility search for unaccounted or escaped inmates;

d. Mass searches or shakedowns of areas of the Jail for contraband items; or

e. To place an inmate in the restraint chair to prevent an inmate from causing injury to himself/herself and to remove an inmate from the restraint chair.[4]

The RRT members assigned to the pre-admissions area of the Jail assist with searches, property removal and inventory,

---

1. Plaintiffs filed their Complaint, intending to represent a class of similarly situated individuals. Doc. Nos. [1], [69]. The present motions involve only the claims of the four named Plaintiffs.

2. In support of their Motions for Summary Judgment, Defendants filed a Statement of Facts (Doc. No. [95-2]). Pursuant to Local Rule 56.1B.(2)a, Plaintiffs submitted responses and also filed statements of additional material facts (Doc. No. [130-7]). Defendants have filed responses to Plaintiffs' statements of additional material facts. Doc. No. [151]. "Where a party does not dispute the other's proposed fact, the Court accepts it for purposes of the instant Motions .... Where a party admits a proposed fact in part, the Court includes the undisputed portion. Where a party denies the other's proposed fact in whole or in part, the Court reviews the record, determines whether a fact dispute exists and, if so, whether it is material. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact. The Court also rules on specific objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the record." Patel v. DeKalb Cty Sch. District, No. 1-12-cv-3522-SCJ-WEJ, Doc. No. [60] (N.D. Ga. June 3, 2014).

3. It is important to note that Plaintiffs' refute the inference that Defendants "are trying to make this case a referendum on the restraint chair." Doc. No. [130], p. 22. Plaintiffs state that "[t]he chair per se is not the issue—like a firearm, it is a tool that can be used properly or abused, and Plaintiffs' focus is on the overall use of force rather than the chair itself." Id.

4. In 2008, RRT was made a full time assignment for those deputies on the team. Prior to that time it had been a part-time position. Deputies would be called in on their days off or from other assignments when needed. Many incidents were occurring for which RRT could not timely assemble. Because deputies without specialized training were being forced to deal with these incidents, several deputies were being injured. The volume of incidents requiring RRT's specialized training

contraband seizure, and if necessary, because they have warrant training, will usually take out necessary warrants when contraband is found.

The pre-admissions area of the Jail in the intake section is where every inmate comes in to be processed. The arresting officer will bring the arrestee into the pre-admissions area, and the inmate will then be placed against a wall to be patted-down while he/she is handcuffed, primarily to make sure there are no weapons. Then, the handcuffs are removed, and the inmate is subject to a more thorough search, and his/her property is taken. The inmate signs a form regarding an inventory of their property. While in pre-admissions, the inmate is thumb-printed; his/her vital information is entered into the Jail Management System; and the inmate is processed through the Rapid ID scan machine, a metal detector, and a body scan machine. Pre-admissions is a small, open area where groups of inmates are staged to be processed. For safety reasons, no more than two inmates are processed at a time. Male and female inmates are brought in together, but they need to be processed separately. If there are any medical or obvious mental health issues, medical personnel or counselors are called to come to pre-admissions to determine whether an inmate needs to go to a different facility. In 2012, the total number of inmates coming through the pre-admissions area for the year was almost 36,000 inmates.

Once a group of inmates has been processed through pre-admissions, they go to the admissions section of the jail. The admissions area is a large, open space where the inmates sit on benches until they are called up individually to complete the booking process. Males sit on one side of the benches, and females sit on the other side of the benches. In admissions, the inmate's paperwork has been given to the civilian staff to complete the booking process. Book-in techs will individually question each inmate and put the detailed information into the Jail Management System. The inmate is informed of the charges, bond amount, and the Jail policy regarding monitoring of phone calls. The inmate is fingerprinted and given an identification armband to wear. A thorough medical screening is performed with individual questioning done by a nurse. Once the booking process is complete, the inmate is placed in an admissions cell with other inmates who have also completed the process. These cells have phones so that the inmate can place a call.

The RRT member assigned to admissions assists with processing intakes, fingerprinting, guarding the nurses, operating the body scanner, performing inmate counts, strip-searching incoming inmate workers, and generally monitoring all in and out movements. All inmates coming to or leaving the Jail go through the admissions area.[5]

was dramatically increasing, and in 2008, the decision was made to make the assignment full-time, put the team members on shift, and put them under the command of the shift supervisors to assign their tasks and direct their actions. After this change occurred, the number of injuries to deputies decreased dramatically. Also, inmates were less likely to be injured because the team members control, restrain and escort inmates using RRT techniques.

5. The RRT also helps to maintain control and order at the Jail. The RRT is called out for a myriad functions. RRT is called to all medical or security related emergencies, inmate fights and "officer needs assistance" calls, and "1013s" (which are inmates that are certified mental health risks). RRT also is called when a police officer brings in a "delta," which is the code for an arrestee that is fighting or otherwise uncooperative in the police car. RRT is also called when an inmate has smeared feces, vomit or other bodily fluid on

While working in the pre-admissions and admissions area of the Jail, the deputies must deal with inmates who exhibit problematic behavior, including, but not limited to, conduct that could lead to that inmate injuring himself/herself (hereinafter "self-harming behavior"), threatening behavior, conduct that could destroy property of the Jail, and attention-getting or nuisance behavior, where the inmate was trying to be disruptive or just cause problems. Specifically, there have been instances where resistant inmates have caused injuries to staff—for example, an inmate exhibiting self-harming behavior has kicked out the cell door window and sustained injuries and an inmate exhibiting self-harming behavior has bitten a deputy.

The inmates coming through pre-admissions and admissions are unpredictable, and little is known about their history, both physical and mental. A high percentage of these inmates are under the influence of drugs or alcohol. Many of these inmates are verbally aggressive, physically resistant, agitated, upset, or angry. Inmates routinely exhibit self-harming behavior in this area of the Jail. In the last several years, there has been a marked increase in inmates that suffer from some form of mental illness, whether mild or extreme, diagnosed or undiagnosed.

Many people are present in the pre-admissions area at any given time, including, but not limited to inmates, arresting officers, officers from various law enforcement agencies, Jail civilian staff, and deputies. Deputies assigned to the pre-admissions and admissions area, especially sergeants, are required to ensure that all of the inmates are dealt with properly and within the policy guidelines of the Department and the Constitution. Given the type and volume of inmate population present in the pre-admissions and admissions area of the Jail, identifying self-harming behavior is an important function of the sergeants assigned to these areas. Inmates exhibiting self-harming behavior once are likely to do it again. Based on his/her education, training, and experience, the sergeant looks at many factors to assess the situation and determine the potential of harm to an inmate, other inmates, and Jail personnel.[6]

Most of the incoming inmates are cooperative while being processed through pre-admissions. However, when inmates are defiant, disruptive, or uncooperative, this type of conduct stops the progression of inmate processing. Therefore, such an inmate is removed from the pre-admissions group population and placed in an isolation cell alone. These cells are located along a hallway off of the pre-admission open area.

When deputies are faced with these types of inmates, especially those exhibit-

themselves or the cell. In these situations the team dons bio-hazard uniforms to remove the inmate from the cell, shower them and decontaminate the cell. In addition to broken sprinkler heads, the team is also called if the inmate has used sink or toilet water to flood their cell, or has used a mattress to attempt to barricade the cell door. RRT also conducts the internal forced blood draws for diagnostics ordered by the medical contractor or forced medication for those inmates who have been medically ordered an emergency dose of psychotropic medications.

The RRT members are also called when an elevator is stuck between floors, on the fairly regular event of an inmate breaking off a sprinkler head and flooding the cell, and when the deputies have intelligence that contraband (weapons, drugs, tattoo paraphernalia, cell phones, etc.) are present in a cell or pod.

6. Plaintiffs do not controvert this sentence, but also do not admit that force is justified against inmates based solely on the belief that they are "likely" to harm themselves. Plaintiffs' arguments regarding use of force will be addressed in the analysis section of this Order.

ing self-harming behavior, they are expected to attempt to de-escalate the situation prior to using any force.[7] De-escalating the situation usually involves communicating with the inmate, and each sergeant employs his/her own techniques in de-escalating self-harming behavior, based on his/her education, training, and experience. Usually, this communication involves establishing a rapport with the inmate, explaining the processing procedures, discussing the problematic behavior and warning an inmate about possible restraint. For the sergeants involved in the use of force against the named Plaintiffs, de-escalation was a habit for these sergeants, and they were anywhere from 80-90% successful in de-escalating situations so that further self-harming behavior was avoided and no further action was necessary to curb the risk of further injury to the inmate. Occasionally, the mere presence of the RRT will cause de-escalation. This is especially true in the admissions/pre-admissions area. The RRT members assigned to those areas will approach an inmate and their mere presence causes de-escalation. Given the size of the Jail and the duties of the deputies, de-escalation of a situation is a "non-event" and is not documented.

For that 10–20% of the time where de-escalation techniques are not successful, the Defendants state that placing an inmate exhibiting self-harming behavior in the restraint chair is usually the best option to stop the risk of further injury to the inmate. This requires deployment of the RRT.[8]

Sergeants must obtain their supervisor's approval before deploying the RRT. Activation of the RRT diverts valuable resources from important tasks within the jail. For sergeants, the efficient and necessary use of resources is a consideration in determining whether to place an inmate in the restraint chair. In obtaining approval to deploy the RRT to place an inmate in the restraint chair, sergeants must communicate with their superiors and explain the situation. The superiors question whether de-escalation techniques have been tried and whether they were successful. Supervisors only call the team when they have determined that other methods of control or de-escalation are insufficient. As such, the decision to deploy the RRT to place an inmate in the restraint chair is made carefully and deployment is done only when necessary and not as a matter of course.[9] On occasion sergeants have been criticized for waiting too long to call on the team, putting the inmate and other deputies at risk of harm.

There have been many occasions when the RRT is called, especially to pre-admissions, and upon arrival are instructed that they are no longer needed, or they determine, in their discretion, that cell entry is no longer necessary.

Upon approval for deployment of the RRT, the sergeant will communicate with the RRT Squad Leader and request the team assemble in the pre-admissions or admissions area in order to place an inmate in the restraint chair.

7. The Jail's Use of Force and Restraints Policy is in the record at Doc. No. [134-3].

8. Plaintiffs controvert this statement to the extent that they allege that the deployment of the RRT leads to the use of excessive force. The Court will address Plaintiffs' excessive force arguments, *infra*.

9. Plaintiffs also controvert this statement/paragraph to the extent that it implies that excessive force was not used against Plaintiffs. Plaintiffs also deny a number of the Defendants' statements to the extent that they imply that the Defendants acted properly toward them. As stated above, Plaintiffs' use of force arguments will be addressed in the next section of this Order.

Because of the RRT's other duties, it can sometimes take from a few to several minutes, and occasionally as long as twenty to twenty-five minutes, to assemble in pre-admissions if the entire team is required. If RRT is already engaged in another incident and then has to decontaminate or retrieve equipment it can take time. The Jail facility is quite large.

Sometimes, at the point where the RRT has assembled in the area and is prepared to make cell entry in order to place an inmate in the restraint chair, the video capture of the event does not show the inmate engaging in self-harming behavior. This does not mean that the inmate is no longer at risk of injuring himself/herself. Inmates who exhibit self-harming behavior will often stop exhibiting the behavior for some period of time, but they will then re-engage and continue the behavior if the situation has not been de-escalated or if they have not been prevented from exhibiting the behavior. Once a video camera is on the inmate in order to try and capture self-harming behavior, the inmate may cease the behavior, but once the camera is off, the inmate will once again engage in their harmful conduct. At times, inmates will escalate their harmful conduct to try to draw the same amount of or more attention. A delay of up to thirty minutes between incidents of self-harming behavior is not unusual. Sometimes the delay results in the inmate getting a "second wind," and the self-harming behavior would worsen.[10]

Sometimes the RRT will use of distraction devices. If, for example, an inmate is in a highly agitated state; has shown a propensity for hitting, kicking, or banging; created a barrier such as wetting the floor or blocking the cell window; or is at risk of fighting the team, the use of distraction techniques upon entry is likely.

Distraction devices are used for a variety of reasons. They are intended to do just that—distract. Many times, but not always, they are fired at the floor. Sometimes an inmate will move and be struck. Other times, the inmate's conduct justifies contact, especially with the lower extremities. This will get them off balance for the split second necessary to gain control. Distraction devices are used if the inmate is right in the doorway to prevent him/her from exiting when the door opens. Distraction devices are also used if the inmate is too far from the door to distract the inmate's attention and give the team time to cover the ground between the door and the inmate. One of the primary distraction devices RRT uses is the PepperBall system. The PepperBall is a non-lethal chemical agent delivery system that uses high-pressure air and carbon dioxide to deliver projectiles. The projectiles are hard plastic balls designed to break and release a chemical agent or talcum powder upon impact. The impact itself is a distraction tool that diverts the inmate's attention away from fighting or resisting. The powder cloud released by the projectile provides an advantage when confronting the inmate, because it is also a distraction. The type of PepperBall projectile most often used by the RRT is filled with a non-caustic powder that has a scent similar to baby powder.

The distraction device used for inmates that are in the doorway upon entry is Hotshot. The delivery device looks like a large pen and is used to discharge a single cloud of powder which may be either inert (talcum/baby powder) or Pava (Pepper). The device has no projectile other than the powder. The inert substance is like having a small amount of baby powder thrown in

---

10. As to the entirety of this paragraph, Plaintiffs do not dispute that this happen "sometimes," but deny any implication that the RRT acted improperly towards them. Doc. No. [130-8], ¶ 34.

your face. The Pava substance is rarely used unless the inmate has a weapon or is barricaded. If the Pava substance is used, the team will wear gas masks.

The RRT occasionally uses the Taser. This device, whether alone or in conjunction with a distraction device, allows the team to quickly gain control of the inmate and place him/her in the chair. There may be occasions when the PepperBall and a Taser are both used upon entry. If the PepperBall appears to not be immediately effective, such as the individual not turning away, not getting to the ground, or moving away from the team, the deputy with the Taser may determine that in order to incapacitate the inmate and prevent a fight, deploying the Taser is appropriate. Other factors the officer with the Taser will take into account are the inmate's size, previous conduct (especially if aggressive or violent), lack of compliance to previous instructions, known or suspected mental health issues, and apparent level of intoxication. The goal is to obtain complete control of the inmate as quickly and safely as possible to prevent injury to officers and the inmate.

The decision to use the PepperBall system or the Taser is made on a case-by-case basis, given the situation as assessed by the sergeant and the squad leader. The use of distraction devices reasonably results in an overall lower level of force needed to place an agitated (or resistant) inmate in the restraint chair and results in a lesser risk of injury.

The RRT may also use pressure point control techniques. These are taught in basic training. It is a pain compliance technique used to get an inmates to change their behavior, comply and submit to control.

Sergeants stay on scene with the inmate and the RRT until such time as the inmate has been placed in the chair and has been medically cleared. As the highest ranking supervisor on-scene, sergeants have the ability to question the RRT's tactics and direct them to act differently, if necessary. It is the sergeant's duty to monitor the situation, to ensure no one is injured, and to ensure policy and procedures are followed. The RRT members know and have been trained that they must obey any redirection by the sergeant.

The RRT Squad Leader also is reviewing the actions of the team and is authorized to redirect their tactics, if necessary.[11] The team leader will observe the team members' actions and evaluate the inmate's actions and words. For example, if the inmate is complaining about an arm or leg, the team leader will assess what the team member on that body part is doing. If the inmate is genuinely complaining, especially with regard to the leg control, the leader will make small adjustments to lessen pressure being applied. If possible and it does not present a danger to the team members, or if it appears that some pressure can be relieved, the leader directs the member to do so. The leader is also looking for incorrect form of the tactics being used, or other things such as cuffs pinching the skin. Often the leader's communication is not verbal but is done with hand motions, helmet taps and perhaps eye contact. The leader is constantly evaluating the totality of the circumstances and the amount of force being exerted and adjusting if necessary. The leader is observing to adjust the level of control up or down as needed.

---

11. If there are adequate numbers, the team leader will not be "hands-on" so as to be better able to observe and direct the team members. If the team leader is "hands-on" he is generally on the head or feet of the inmate, so as to be in the best position to observe and direct the team members.

Regarding the force used by the RRT upon entering a cell, the team performs a "dynamic entry," in much the same way as a SWAT team. The focus is on speed, surprise, and immediate action so that the inmate does not have time to physically respond. To this regard, there is usually a minimum of four team members.

Other factors, such as the size of the inmate, his/her location in the cell, whether he/she is sitting, standing or lying down, whether he/she is on the floor or a bench, whether he/she has complied with instructions to move to a particular location in the cell, get down, and a myriad other factors dictate how the team will perform its function.[12]

An inmate may be taken out of the restraint chair prior to four hours. This determination is made by the sergeant on a case-by-case basis, depending primarily on the inmate's behavior, attitude, and demeanor. Often, when the inmate is intoxicated, remaining in the chair assists in the dissipation of the drugs/alcohol from his/her system. The sergeant must consider whether the inmate will continue to exhibit the problem behavior, such as self-harming behavior, or whether he/she has sufficiently calmed down so that he/she no longer needs to be restrained. The sergeant must evaluate whether it is likely that force will be needed again once the inmate is out of the restraints. The RRT is deployed to take an inmate out of the restraint chair. The time it takes for the RRT to come back to pre-admissions from the various team members' posts throughout the Jail is also a consideration in removing an inmate from the restraint chair.

Approximately 75–80% of uses of force take place in the pre-admissions area of the Jail. Every use of force at the Jail must be documented with a use of force report, and if at all possible, the use of force should be videotaped. Documentation helps to remove any doubt as to controversy over what happened, to assist in the elimination of false accusations, to review and continue to assess how the deputies are conducting themselves, and for training purposes.

The sergeants are responsible for creating a use of force file and ensuring that it gets uploaded to the Jail's computer network. As it pertains to an organized use of force executed by the RRT that results in an inmate being placed in a restraint chair, a use of force file usually consists of the following:

 a. Use of Force Report and possible supplemental reports;

12. Examples are as follows. With the prone inmate, the RRT will still move quickly to obtain total control of the inmate. Depending upon the circumstances, a distraction device may be deployed to ensure that the inmate is focused on something and does not try to get up. Many times the team has experienced an inmate on the floor, who immediately upon the team's entry attempts to get up or roll over, both of which present a danger to the team members and the inmate and ultimately requires more force to obtain compliance.

The inmate's actions dictate the amount of force the RRT will be required to use. Even with an inmate prone, the RRT members must still protect the inmates head, control the legs and control the arms to get the inmate cuffed. The leg control is particularly important to prevent the inmate from rolling over or kicking.

Obviously more force will be used if the inmate is non-compliant or actively resists. The initial goal is to gain control as quickly and safely as possible and get the inmate on his stomach in such a position that he/she cannot fight or get up. As for controlling the inmate's head, the primary purpose of head control is to protect the inmate and keep his/her head and neck as safe as possible. The technique is also intended to protect the other deputies and the medical personnel, to prevent the inmate from biting or spitting at them. The team members are not trained to punch inmates in the face or head. In fact, they are trained not to do so.

b. Video(s);

c. Restraint Chair Log; and

d. Routing Sheet.

The written use of force report is to be completed as soon as possible after the incident, but no later than the end of the shift. The deputy who used force is to write the report. In the case of a team deployment by the RRT, the squad leader designates one team member who participated in the force to write the report. Every use of force file is reviewed by the chain of command. The purpose of the review is to determine if the use of force was within policy. Ideally, each link in the chain does a review. Routinely, however, there are instances where each link of the chain of command does not review the use of force file. This would be due to the unavailability of that particular supervisor. The review process continues without a particular supervisor so that the review process is completed timely. The review process is documented on the routing sheet. After this review, the use of force file is forwarded to the Training Section of the Sheriff's Department. The Professional Standards Unit (hereinafter "PSU") maintains the use of force file for the Department. No PSU investigations have been initiated regarding the organized uses of force of the RRT that resulted in an inmate being placed in the restraint chair.

On March 31, 2014, Defendants Sims, Conway, and Pinkard filed motions for summary judgment. Doc. Nos. [94],[13] [95]. Plaintiffs have filed a consolidated response brief. Doc. No. [130]. The Defendants have filed reply briefs. Doc. Nos. [149], [150]. The Court held a hearing on December 15, 2014.

 On February 12, 2015, this Court entered an order granting the pending motions for summary judgment. Doc. No. [166]. Said order and resulting judgment were appealed to the Eleventh Circuit Court of Appeals by Plaintiffs. Doc. No. [169]. While on appeal, the United States Supreme Court issued an opinion in the case of Kingsley v. Hendrickson, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). In Kingsley, the Supreme Court resolved the issue of the proper standard for a pretrial detainee to prove an excessive force claim. The Supreme Court stated that the pretrial detainee must show that the officers' use of force was objectively unreasonable. Id. at 270.[14] On August 20, 2015, the Eleventh Circuit vacated and remanded the Court's February 12, 2015 final order and judgment for further proceedings in light of the Supreme Court's decision in Kingsley. This Court thereafter permitted supplemental briefing by the parties and will now reconsider the

---

**13.** Defendant Sims filed his motion, separate from Conway and Pinkard, due to having formerly served as the Commander of the RRT and having responsibility for reviewing use of force reports and training the RRT, while in that capacity—a role different from Defendants Conway and Pinkard, as Sheriff and Jail Administrator, respectively. Doc. No. [94-1], p. 16. Plaintiffs also state that this is not a failure to train case. Doc. No. [130], p. 3.

**14.** The Eleventh Circuit's prior authority set the standard as follows. A jailer's use of force against a pretrial detainee is excessive under the Fourteenth Amendment if it "shocks the

conscience." Fennell, 559 F.3d at 1217 (citations omitted). "The use of force does not 'shock the conscience' if it is applied 'in a good-faith effort to maintain or restore discipline.'" Id. "However, if the force is applied 'maliciously and sadistically to cause harm,' then it does 'shock the conscience,' and is excessive under the Eighth or Fourteenth Amendments." Id.; see also Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir.2007) ("Government action, including the use of force by prison guards, will only violate substantive due process rights under the Fourteenth Amendment when it is so egregious that it shocks the conscience.").

summary judgment motions in light of Kingsley.

## II. LEGAL STANDARD

Plaintiffs bring this Complaint under 42 U.S.C. § 1983,[15] alleging excessive force in violation of the Fourteenth Amendment.[16] See Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir.2003) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause, instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.") (citations omitted).[17]

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is

**15.** Said Code Section provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. The Fourteenth Amendment to the United States Constitution provides in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 2; see also Ort v. White, 813 F.2d 318, 326 (11th Cir.1987) (holding that inmates may not be deprived of life, liberty, or property without due process of law).

**16.** Said claim is in the Complaint at Doc. No. [69], p. 22. Plaintiffs also state in their motion for summary judgment: "Each Plaintiff alleges the same conduct and a violation of the same right—the right of an inmate to be free from excessive force and abuse while in custody." Doc. No. [130], p. 8.

**17.** There is Eleventh Circuit authority that holds that a claim of excessive force under the Fourteenth Amendment is analyzed as if it were an excessive-force claim under the Eighth Amendment. This authority permitted district courts to look to decisional law of excessive-force claims under both the Fourteenth and Eighth Amendments. Fennell v. Gilstrap, 559 F.3d 1212, 1216 n. 5 (11th Cir.2009). However, said prior Eleventh Circuit authority is now in question in light of the Supreme Court holding in Kingsley v. Hendrickson, in which the Supreme Court indicated that the language of the Eighth and Fourteenth Amendments differ and the nature of the claims often differ as pretrial detainees cannot be punished. 135 S.Ct. at 2475. The Supreme Court further stated that "there is no need [in a Fourteenth Amendment pretrial detainee case], as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional." Id.

**18.** On December 1, 2010, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. The amendments to Rule 56 "are intended to improve the procedures for presenting and deciding summary-judgment motions" and "are not intended to change the summary-judgment standard or burdens." Committee on Rules of Practice and Procedure, Report of the Judicial Conference, p. 14 (Sept. 2009). Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 n. 4 (1st Cir.2011). "[B]ecause the summary judgment standard remains the same, the amendments 'will not affect continuing development of the decisional law construing and applying' the standard now articulated in Rule 56(a). Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.). Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule. Murray v. Ingram, No. 3:10–CV–348–MEF, 2011 WL 671604, *2 (M.D.Ala. Feb. 3, 2011), adopted by Murray v. Ingram, No. 3:10–CV–348–MEF, 2011 WL 686203 (M.D.Ala. Feb. 18, 2011).

"material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir.2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir.1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All reasonable doubts should be resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." Id. (citations omitted).

## III. ANALYSIS

Plaintiffs argue that a jury could find that Defendant Sims trained and directed the RRT to use excessive force,[19] and that Defendants Conway and Pinkard enabled Defendant Sims to do so by failing to enforce their own policies and encouraging the RRT to continue to use excessive force. Doc. No. [130], pp. 32–33.

### A. Direct Liability

In their Complaint, Plaintiffs argue that Defendants, who are supervisors,[20] are directly liable for their involvement in the training and commanding of the Rapid Response Team. Doc. No. [69], p. 24, ¶ 70.

■ The Eleventh Circuit has held that "[t]here are two ways in which an individual may be held liable under § 1983—he may be sued for his own personal actions ('direct liability'), or, under certain limited circumstances, for the actions of his subordinates." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). "A supervisor, of course, may be held responsible under either or both theories." Id. at 1263 n. 5 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [supervisoral liability].")) (alteration in original, emphasis added). After reviewing said Eleventh Circuit authority,

---

19. As stated by Defendants, "Defendant Sims was formerly the Commander of the RRT and in that capacity reviewed use of force reports involving the RRT and was responsible for training of the RRT." Doc. No. [94-1], p. 16.

20. In their Complaint, as amended, Plaintiffs refer to Defendant Conway, as the duly elect-

ed sheriff of Gwinnett County, Georgia, Defendant Colonel Pinkard, as the Administrator of the Gwinnett County Jail, and Defendant Lieutenant Colonel Sims, as the Deputy Administrator of the Gwinnett County Jail and the Commander of the Jail's RRT. Doc. No. [69], p. 3, ¶¶5–7.

the Court is of the opinion that the "direct liability" urged by Plaintiffs is actually reviewed in the context of supervisory liability under the "personal participation" prong of the supervisory liability standard. To this regard, the Court will move on to the supervisory liability analysis section of this Order.

## B. Supervisory Liability

In the Complaint, Plaintiffs argue that Defendants have supervisory liability under 42 U.S.C. § 1983 for violation of the constitutional rights of Plaintiffs. Doc. No. [69], p. 24, ¶ 70. In their briefing on the pending motions, Plaintiffs set forth a list of facts supporting supervisory liability of Defendants. Doc. No. [130], p. 13. This Court must determine whether the specific facts satisfy the Eleventh Circuit's supervisory liability standards.

■ The Court first notes that Plaintiffs' claims "cannot succeed without evidence of an underlying constitutional violation." Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir.1999). As determined in the next section of this Order, the Court finds the absence of a constitutional violation of Plaintiffs' rights; accordingly, there can be no supervisory liability. Nevertheless, in the interest of caution, the Court will conduct the remaining supervisory liability analysis.

■ "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional

conduct[21] or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." Keith v. DeKalb Cty., Georgia, 749 F.3d 1034, 1047–48 (11th Cir.2014) (internal citations and quotations omitted). In short, "the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Keith, 749 F.3d at 1048 (citations omitted).

■ As to the first requisite showing (i.e., personal participation), Plaintiffs argue that Defendants are directly liable for their involvement in the training and commanding the Rapid Response Team. In opposition, Defendants argue a lack of personal participation. Doc. No. [95-1], p. 20. Defendants state that the "undisputed facts are that these Defendants, the Sheriff and two Colonels never touched the Plaintiffs, were not present when Plaintiffs were restrained, and were rarely, if ever, present for such events." Doc. No. [191], p. 4 (emphasis omitted).

After review, in the absence of on-the-scene involvement, in the absence of this being a failure to train case (which Plaintiffs concede),[22] and in the absence of analogous or "on point" Eleventh Circuit authority (upholding a similar theory of direct liability as asserted by Plaintiffs), the Court is unable to conclude that Plaintiffs have established the requisite showing of direct liability.

Next, the Court will consider the causal connection showing of supervisory liability.

■ "The necessary causal connection can be established when a history of widespread abuse[23] puts the responsible

---

**21.** According to Defendants, "No evidence is present that Sims was involved in (1) the decision to activate the RRT with regards to each Plaintiff, (2) the placement any of the named Plaintiffs in the restraint chair, or (3) the monitoring of any of the Plaintiffs after

their placement in the chair." Doc. No. [94-1], p. 17 (citing SOF ¶¶ 97, 100).

**22.** Supra, n.13.

**23.** "The deprivations that constitute widespread abuse sufficient to notify the supervis-

supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy ... result[s] in deliberate indifference [24] to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Keith, 749 F.3d at 1048 (citations and quotations omitted). "Therefore, if [Defendants are] to be held liable, [they] must have failed to correct a widespread pattern of constitutional violations or [they] must adopted a custom or policy that deprived [Plaintiffs] of [their] constitutional rights. Id.

Plaintiffs argue that "[t]here are genuine issues of material fact as to whether there is a 'causal connection' between the actions of Defendants Conway, Pinkard and Sims and the use of excessive force by the RRT." Doc. No. [130], p. 32. The Court does not agree.

 The evidence, here, shows that Sheriff Conway has never had any complaints from inmates regarding RRT's treatment of that inmate. Doc. No. [95-2], p. 31, ¶ 71. Sheriff Conway has received complaints from one family member of an inmate regarding the way RRT treated the inmate. Id. at ¶ 72. Sheriff Conway reviewed the matter and found no issue. Id. Other than the family member complaint, no one has ever complained directly to Sheriff Conway about the RRT. Id. at ¶ 73.

Accordingly, the Court agrees with Defendants that in the absence of evidence that there was a history of complaints from Sheriff Department employees,[25] inmates, or the community, Plaintiffs have not shown widespread abuse. Doc. No. [95-1], p. 23. There is also no evidence in the record to support the assertion that Defendants were on notice of the need to correct a problem with the RRT's use of the restraint chair. Id.

The Court will next consider the custom and policy prong of the causal connection analysis.

In their brief, Plaintiffs state: "when supervisors fail to enforce a written use of force policy as the Defendants did in this case, their actual "custom or policy" is not what is in writing and never enforced, but what the supervisors actually condone and encourage in practice." Doc. No. [130], p. 27. Plaintiffs argue that "[a]dherence to a custom of allowing subordinates to use excessive force, whether permitted by written policy or not, establishes a sufficient causal connection to impose supervisory liability under Section 1983." Id. at pp. 27–28. Plaintiffs further argue that "[t]he evidence is strong that Defendants not only knew exactly what the RRT was doing, but that the RRT was doing exactly what Defendants wanted. Not only does that authorize an inference that Defendants knew the RRT was using excessive force and failed to correct it, but that Defendants were actually directing the RRT to act as

---

ing official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Keith, 749 F.3d at 1048 (quotations and citations omitted).

24. "Deliberate indifference requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Keith, 749 F.3d at 1047 (internal citations and quotations omitted).

25. The Court recognizes that in his deposition, Sheriff Conway discusses the "criticisms" that Lieutenant Cofer had of the RRT. (Doc. No. [142], Conway depo. pp. 78–85). However, Plaintiffs describe Cofer's comment in regard to the video of Plaintiff Lunde (Doc. No. [130], p. 9), which is not relevant (in terms of the applicable time period) to the determination of whether there was a "history of complaints" prior to Plaintiff Lunde's incarceration.

it did." Id. at p. 29. Plaintiffs also state: "Conway and Pinkard both have authority to take corrective action if the RRT is using excessive force, but neither has done so, and their failure to do so only encourages the continued use of excessive force by the RRT." Doc. No. [130], p. 31.

After review, the Court is unable to uphold Plaintiffs' argument as the Eleventh Circuit has held that the supervisor must have actual or constructive notice of a flagrant, persistent pattern of violations of the policy. Keith, 749 F.3d at 1049 (citing Goebert v. Lee Cty., 510 F.3d 1312, 1332 (11th Cir.2007). Here, the evidence does not show that Defendants had such notice or that they directed or otherwise knew that their subordinates would act unlawfully.

In sum, Plaintiffs have not satisfied the extremely rigorous standard required to show supervisory liability.

## C. Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir.2007) (internal citations omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002) (citing Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pear-

son v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The immunity protects "all officials except 'the plainly incompetent or those who knowingly violate the law.'" Doe v. Braddy, 673 F.3d 1313, 1317 (11th Cir. 2012) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). It is "'an immunity from suit rather than a mere defense to liability.'" Scott v. Harris, 550 U.S. 372, 376, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

In a qualified immunity analysis, the burden lies first with the official to "'prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Lee, 284 F.3d at 1190). If the official meets this burden, then "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir.2013) (citing Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir.1996)).

### 1. Discretionary Authority

The Court begins its qualified immunity analysis by considering the Defendants' burden to prove that they were acting within the scope of their discretionary authority while serving as Sheriff (Conway), Jail Administrator (Pinkard), and Commander of the RRT (Sims).

To meet their burden, Defendants must prove that they were "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [their] power to utilize." Holloman, 370 F.3d at 1265. The Court looks to "the general nature of [a] defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional

purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. at 1266. After review, in the case *sub judice*, it appears that the issue of whether Defendants were acting within the scope of their discretionary authority is not disputed. The Court finds that Defendants have met their burden of proving that they were acting with the scope of their discretionary authority. The burden now shifts to Plaintiffs to establish that qualified immunity is not appropriate.

### 2. Inquiry

"The qualified immunity inquiry usually involves two prongs. First, a plaintiff must show that a constitutional or statutory right has been violated. Second, a plaintiff must show that the right violated was clearly established." Fennell, 559 F.3d at 1216–17 (citations omitted).

■ Accordingly, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiffs' allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

### a. whether Plaintiffs have shown facts that make out a violation of a constitutional right

Plaintiffs argue that: "[i]n each case, the inmate was subjected to force that was gratuitous and unnecessary—either because the inmate's behavior never rose to the level of a threat warranting the use of force in the first place, or because any alleged threat had subsided and there was no need for physical force at the time force was used." Doc. No. [130], p. 8.[26] Plaintiffs argue that it is a jury question as to whether the use of force against them was objectively unreasonable. Doc. No. [190], pp. 2, 6.

■ The United States Supreme Court has held that in deciding whether the force used against a pretrial detainee is constitutionally speaking, "excessive," "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015).[27] "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. "A court (judge or jury) cannot apply this standard mechanically." Id.[28]

---

**26.** The United States Supreme Court has also recognized a premise in Eleventh Circuit authority that "physical abuse directed at [a] prisoner after he terminate[s] his resistance to authority would constitute an actionable [constitutional] violation." Hope, 536 U.S. at 743, 122 S.Ct. 2508 (citing Ort v. White, 813 F.2d 318 (11th Cir.1987)). In Ort, the Eleventh Circuit stated in relevant part:

> Clearly, appellant would have a legitimate due process claim if, after the misconduct or disturbance had abated, prison officials had ... imposed any other form of punishment without first affording him some type of disciplinary hearing. A fourteenth amendment violation occurs in this context where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased.

813 F.2d at 327.

**27.** This standard is not totally unfamiliar to Eleventh Circuit jurisprudence. See e.g., J.B. ex rel. Brown v. Amerson, 519 Fed.Appx. 613 (11th Cir.2013) (applying objectively unreasonable standard to a § 1983 action against county sheriff and deputy for alleged violation of minor's Fourth Amendment right against use of excessive force).

**28.** Kingsley did not involve supervisors, as in the case *sub judice*. See Biddle v. Parker, No. CV 13–343–RGA, 2015 WL 5190694, at *2 n. 4 (D.Del. Sept. 4, 2015) ("Plaintiff cites the Supreme Court's recent decision in Kingsley v. Hendrickson, holding that 'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.' —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). Both of

 "The following considerations may bear on the reasonableness or unreasonableness of the force used: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting." Kingsley, 135 S.Ct. at 2473. "This list is non-exclusive and is used only to 'illustrate the types of objective circumstances potentially relevant to a determination of excessive force.'" Id.

 The objective reasonableness determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. The "court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id. (internal citations omitted).[29]

The Court now considers the above-stated six-factor analysis (as to each Plaintiff)[30] to determine if there is evidence to show that the force at issue was objectively unreasonable, and thus violated the Fourteenth Amendment.

### i. Justin Shuford

 Justin Shuford was arrested in Cobb County and brought to the Gwinnett County Jail on the afternoon of April 11, 2013. Doc. No. [95-2], ¶ 111. Initially Shuford was in a cell with other inmates. Id. at ¶ 112. Around 6:48 p.m., Shuford was removed from that cell after being told to move away from the window and failing to do so. Id. at ¶ 113.[31] Shuford was hungry, but was required to throw his sandwich away when he was removed from the larger cell. Id. at ¶ 115. Shuford was frustrated and expressed that frustration. Id. at ¶ 116. On the video (simultaneously recorded with the RRT's use of force), Shuford acknowledges that he was upset when they took his "lunch." Id. at ¶ 117. Sergeant Gregory Ross wrote in his report that Shuford "began raising his voice to the deputies" and was "loud and boisterous" at this time. Doc. No. [101-4], p. 3. When Shuford was placed in the isolation cell, he hit the metal partition. Doc. No. [95-2], ¶ 119. When he hit the partition it was "pretty noisy so anybody could hear it." Id. at ¶ 120. Sergeant Ross wrote in his Use of Force Report that "[h]itting the wall and

these cases, however, address claims against officers, not supervisors. Thus, neither case is on point for the purpose of this motion.").

**29.** The Supreme Court further stated: "It is unlikely (though theoretically possible) that a plaintiff could overcome these hurdles [*i.e.*, the above-stated reasonable officer perspective, deference to policies and procedures needed to preserve internal order, discipline/security, and qualified immunity] where an officer acted in good faith." Kingsley, 135 S.Ct. at 2474–75.

**30.** Plaintiffs argue that "[r]easonable jurors could view the videos [of the force used

against Plaintiffs by the RRT] and conclude that the RRT routinely engages in the use of excessive force, and that it used excessive force against the four Plaintiffs." Doc. No. [130], p. 11. However, Plaintiffs' argument does not take into consideration the above-stated factors set out by the Supreme Court in Kingsley and accordingly, fails.

**31.** The Gwinnett County Use of Force Report states that "was initially taken from Admissions to Pre-Admission for continuing to make lewd hand & mouth gestures to female inmates in adjacent cells." Doc. No. [101-4], p. 3.

partition created the risk of self-harm." Doc. No. [101-4], p. 3.

According to Plaintiffs, Justin Shuford was standing quietly and alone in a holding cell when the RRT rushed in without warning, shot him with some kind of gun,[32] slammed him to the floor, applied pressure to his neck, foot, head and hands to inflict pain, and threw him into a restraint chair. Doc. No. [130], p. 8. Several times after he is restrained, Shuford can be heard stating "I'm sorry, I'm sorry." Doc. No. [95-2], ¶ 122.

At the end of the video, the nurse assesses Shuford, taking his vitals and checking the restraints, one of the handcuffs is loosened at the nurse's request. Doc. No. [95-2], ¶ 123. Although very talkative, Shuford does not complain about any specific injuries when the nurse is assessing him. Id. at ¶ 124.

Shuford was placed in the restraint chair at approximately 7:20 p.m. and was removed at 11:00 p.m. He was checked consistently during that time by jail staff and medical personnel. Id. at ¶ 125. One of the medical checks is also videoed as the nurse listens to his complaints, assesses him and provides him with water. Id. at ¶ 126.

Shuford was at the Jail for two weeks and was permitted to be an inmate worker while he was there. Id. at ¶ 127. Shuford never filed a grievance while at the jail and never complained to PSU after being released. Id. at ¶ 128. Shuford did not seek medical treatment after being released from jail. Id. at ¶ 129. The placement of Shuford in the restraint chair was reviewed by the chain of command and found to be within policy. Id. at 130.

In this case, considering all the factors and the above-stated standard, Plaintiffs' evidence fails to show that the force used by Defendants' subordinates was objectively unreasonable.[33]

More specifically in regard to the Kingsley factors concerning the need for the use of the force, the severity of the security problem, the threat reasonably perceived by the officer, and whether plaintiff was actively resisting, the Court finds as follows. The Court finds that there was a legitimate need for the application of force (and a threat to Plaintiff Shuford's personal safety) based on Sergeant Ross's determination that Shuford's hitting the wall and partition created a risk of self-harm.[34] While Plaintiffs' argue (as to each Plaintiff)

---

**32.** Defendants state that it was an inert Pepperball device. Doc. No. [95-1], p. 8. The Use of Force Report further states that "Due to Inmate Shuford's spontaneously aggressive behavior and near constant pacing, the team deployed the SA-4 as direct impact distraction." Doc. No. [101-4], p. 3. It appears to the Court that the SA-4 is the Pepperball distraction device.

**33.** Defendants have cited authority, which this Court agrees provides guidance, though decided prior to Kingsley. See Doc. No. [149], p. 5 (citing Campbell v. Sikes, 169 F.3d 1353, 1374–77 (11th Cir.1999) (use of "L" shaped restraint and straightjacket was permissible use of force on inmate who had taken affirmative acts towards harming herself and posed a serious threat of further self harm); Stanfill v. Talton, 851 F.Supp.2d 1346, 1371 (M.D.Ga. 2012) (inmate's self-harming behavior author-

ized use of force and placement in restraint chair); Slaughter v. Dooly Cty, No. 5:06–CV–143, 2007 WL 2908648 at *10 (M.D.Ga. Sept. 28, 2007) (need for force legitimate where plaintiff was placed in the restraint chair because she continued to strike the cell with her hands and feet and demonstrated a risk of self harm)).

**34.** In accordance with Kingsley, as to each of the named Plaintiffs, the Court makes the reasonableness determination from the perspective of a reasonable officer on the scene; accounts for the legitimate interests that stem from the need to manage the facility; and gives deference to the Jail's policy on suicide/self-injury, as well as the use of force policy which allows the use of restraints "to prevent inmates from causing injury to themselves." Doc. Nos. [109-1]; [134-3], p. 3, ¶ C.

that the "videos evidence shows that any such threat had dissipated by the time the force was used. ... [and] [a]ny arguments about events occurring off-camera, before the video started rolling, to justify the RRT's use of force, is an argument that must be decided by a jury," ( Doc. No, [130], p. 24), the Court is unable to uphold said argument. There is evidence in the record that inmates exhibiting self-harming behavior once are likely to do it again (Doc. No. [95-2], ¶ 18), and will stop exhibiting the behavior for a period of time, then, re-engage and continue the behavior if the situation has not been de-escalated. Id. at ¶ 34. There is also Eleventh Circuit authority indicating that officials "need not wait until disturbances reach dangerous proportions before responding." Cockrell, 510 F.3d at 1311. Accordingly, Plaintiffs' arguments fail on this ground, as Defendants have presented evidence to show that the necessity for the force had not ceased at the time that the RRT encountered Plaintiff Shuford and having already observed Plaintiff Shuford's pre-video recording behavior, Defendants' subordinates were not required to wait to restrain Plaintiff Shuford.

As to the relationship factor (*i.e.*, the relationship between the need and the amount of force that was used), as in the case of Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir.1991), the Court concludes that "[t]he four-point restraints were used to reduce or eliminate [Shuford's] ability to inflict physical harm against ... himself ...."

As to the injury factor (*i.e.*, the extent of injury inflicted upon Shuford), Shuford had an impact mark from the distraction device and a small cut in his lip. Doc. Nos. [95-1], p. 9, [101-4], p. 3. The Court finds that while there is evidence that Shuford experienced discomfort because of his restraint, the impact mark and small cut to his lip are not serious or permanent injuries.

In regard to the severity factor (*i.e.*, any efforts made to temper the severity of the forceful response), the Court concludes that the evidence shows that a nurse immediately checked Shuford upon his being secured in the restraint chair. He was also regularly monitored for the three hours and forty minutes that he remained in the chair. Doc. No. [101-1], p. 1.

#### ii. Andres De Jesus

 Andres De Jesus was arrested and brought to the Gwinnett County Jail about 5:33 a.m. on June 15, 2013. Doc. No. [95-2], ¶ 150. DeJesus recalled consuming at least six alcoholic beverages (specifically Hennessy) over the course of approximately two hours. Id. at ¶ 148. He was also drinking Red Bull. Id. Earlier in the day, DeJesus had smoked marijuana. Id. at ¶ 149.

De Jesus was initially placed in a room with other inmates. Id. at ¶ 149. The Use of Force Report states that DeJesus "began to act aggressively towards another Inmate." Doc. No. 102-3, p. 2. DeJesus was then moved to an isolation cell. Doc. No. [95-2], ¶ 152. While in the isolation cell, he attempted to get a deputy's attention including knocking on the door or window and "got a little frustrated, got a little loud." Id. at ¶ 153. DeJesus recalls very little from this time period. Id. at ¶ 154. On the video, DeJesus admits he "woke up confused, because he was drunk earlier and he was banging the wall." Id. at ¶ 155. The Use of Force report states that "Sergeant Hayes instructed Inmate DeJesus to stop [striking the cell walls] and he refused to comply." Doc. No. [102-3], p. 2. The Use of Force Report states that "Sergeant Hayes made the decision to place Inmate DeJesus into a restraint chair to prevent him from harming himself." Id.

Per Plaintiffs, Andres De Jesus was kneeling on the floor, quietly and alone in a holding cell, when the RRT burst through the door and attacked him. Doc.

16-5—De Jesus Aff. ¶6; Doc. No. [130], p. 8.[35]

During the RRT encounter (as video-recorded), Sergeant Hayes specifically asks the nurse to check his right elbow that DeJesus used to hit the wall. The nurse is seen doing this. Doc. No. [95-2] at ¶ 156.

At the end of the video, the nurse assesses DeJesus, taking his vitals and checking the restraints. Id. at 159. Although talkative, DeJesus does not complain about any injuries from the restraint process in the video when the nurse is assessing him. Id. at 160. DeJesus was placed in the restraint chair at approximately 7:45 a.m. and was removed at 11:52 a.m., four hours and seven minutes. He was checked consistently during that time by jail staff and medical personnel. Id. at 161. The placement of DeJesus in the restraint chair was reviewed by the chain of command and found to be within policy. Id. at 162.

In this case, considering all the factors and the above-stated standard, Plaintiffs' evidence fails to show that the force used by Defendants' subordinates was objectively unreasonable.[36] The Court finds that there was a legitimate need for the application of force (and a threat to Plaintiff DeJesus's personal safety) based on Sergeant Hayes' determination that there was a need to prevent DeJesus from harming himself after DeJesus's admitted banging on the jail wall.[37]

As to the relationship factor (i.e., the relationship between the need and the amount of force that was used), as in the case of Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir.1991), the Court concludes

that "[t]he four-point restraints were used to reduce or eliminate [DeJesus's] ability to inflict physical harm against . . . himself . . . ."

As to the injury factor (i.e., the extent of injury inflicted upon DeJesus), the Court finds that while there is evidence that DeJesus experienced discomfort because of his restraint, there is no evidence of actual injury inflicted. Cf. Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir.2002) (holding that where officer applied the "pain compliance handcuffing technique," "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.").

In regard to the severity factor (i.e., any efforts made to temper the severity of the forceful response), the Court concludes that the evidence shows that a nurse immediately checked DeJesus upon his being secured in the restraint chair. He was also regularly monitored during the time (four hours and seven minutes) that he remained in the chair. Doc. No. [102-1], p.1.

### iii. Ryan Anisko

■ Anisko was arrested for DUI after being involved in an accident. Doc. No. [95-2], ¶ 132. He was arrested and brought to the jail about 12:42 a.m. on February 18, 2013. Id. at ¶ 133. Anisko does not recall how much he had to drink other than it was more than five alcoholic beverages and recalls that his BAC was .27. Id. at ¶ 134. Anisko consumed the alcohol between finishing work and when he was brought to the jail at about 12:42 a.m. Id. at ¶ 135.

The Gwinnett County Use of Force Report states that while waiting to be scanned, Anisko "was becoming uncooperative" and was placed in "P-Cell #3," an

---

**35.** DeJesus does not allege that Tasers or distraction devices were used against him.

**36.** Supra, at nn.33, 34.

**37.** Plaintiff DeJesus raises arguments identical to Plaintiff Shuford, concerning the threat

having dissipated by the time the force was used by the RRT; however, the Court is unable to uphold DeJesus's arguments based on its holding as to Plaintiff Shuford.

isolation cell. Doc. No. [103], p. 2. In his deposition, Anisko was unable to recall this time period. Doc. No. [120], depo., pp. 26–28. After being placed in the isolation cell, Anisko was knocking on the door "probably nonstop." Doc. No. [95-2], ¶ 137. The Use of Force Report states that Anisko hit the door of the cell "with his head and his hands," "with enough force to cause physical harm to himself." Doc. No. [103-3], p. 2. Sergeant Tim Smith made the decision to place Anisko in the restraint chair for his own safety. Id. Anisko also struck the door after the camera was turned on to record the RRT encounter. Id. at ¶ 138.[38]

Per Plaintiffs, Ryan Anisko had verbally taunted an officer who refused to give him a pen to complete his paperwork, but his behavior was disrespectful rather than threatening and he was lying face down on the floor as instructed when the RRT rushed in and jumped on top of him, applied weight and pressure points to his body, and then threw him into a restraint chair. Doc. No. [16-4]—Anisko Aff. ¶¶4-9; Doc. No. [130], p. 8.

At the end of the video (of the RRT encounter), the nurse assesses Anisko, taking his vitals and checking the restraints. Doc. No. [95-2], ¶ 140. Although very talkative, Anisko does not complain about any injuries from the restraint process in the video when the nurse is assessing him. Id. at ¶ 141.

Anisko was placed in the restraint chair at approximately 1:35 a.m. and was removed at 5:05 a.m., three hours and thirty minutes. He was checked consistently during that time by jail staff and medical personnel. Id. at ¶ 142. After Anisko was removed from the chair, a deputy offered

to provide him with food and brought him a couple sandwiches. Id. at 143. Anisko did not seek any medical treatment for any injuries after he left the jail. Id. at ¶ 143.

The placement of Anisko in the restraint chair was reviewed by the chain of command and found to be within policy. Id. at 145.

In this case, considering all the factors and the above-stated standard, Plaintiffs' evidence fails to show that the force used by Defendants' subordinates was objectively unreasonable. The Court finds that there was a legitimate need for the application of force based on Anisko's BAC at .27 and Anisko's actions of hitting the door of the cell "with his head and his hands," "with enough force to cause physical harm to himself, as well as Sergeant Tim Smith decision to place Anisko in the restraint chair for his own safety.[39] The Court does not agree with Plaintiffs' argument that the behavior was solely disrespectfully, as opposed to exhibiting a risk for self-harm.[40]

As to the relationship factor (i.e., the relationship between the need and the amount of force that was used), as in the case of Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir.1991), the Court concludes that "[t]he four-point restraints were used to reduce or eliminate [Anisko's] ability to inflict physical harm against ... himself ...."

As to the injury factor (i.e., the extent of injury inflicted upon Anisko), the Court finds that while there is evidence that Anisko experienced discomfort because of his restraint, there is no evidence of actual injury inflicted. Cf. Rodriguez, 280 F.3d at 1351 (holding that where officer applied

---

38. Doc. No. [116] at 2:25.

39. *Supra*, at nn.33, 34.

40. Plaintiff Anisko raises arguments identical to Plaintiff Shuford, concerning the threat having dissipated by the time the force was used by the RRT; however, the Court is unable to uphold Anisko's arguments based on its holding as to Plaintiff Shuford.

the "pain compliance handcuffing technique," "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.").

In regard to the severity factor (*i.e.*, any efforts made to temper the severity of the forceful response), the Court concludes that the evidence shows that a nurse immediately checked Anisko upon his being secured in the restraint chair. Doc. No. [103-3], p. 2. He was also regularly monitored during his time in the chair. Doc. No. [103-1], p.1.

#### iv. Devin Lunde

On June 15, 2013, Plaintiff Devin Lunde was arrested in Gwinnett County. Doc. No. [95-2], ¶ 163. Lunde was arrested for Loitering after refusing a police officer's request to leave the location where he was parked. Id. at ¶ 164. He was arrested and brought to the jail sometime before 6:30 p.m. on June 15, 2013. Id. at 165. Lunde was placed in a isolation cell immediately after pat-down. Id. at 166.

Sergeant Ross wrote in the Use of Force Report that he was advised by one of the deputies that Lunde had struck the cell window hard enough to make it bow. Doc. No. [104-5], p. 3. Sergeant Ross further wrote that "[t]his behavior could likely result in self-harm." Id. at p. 3.

Lunde went behind the metal partition in the jail cell and hit the partition more than once, making a loud noise that Sergeant Ross could hear from the other side of pre-admissions. Doc. No. [95-2], ¶ 173.

The Use of Force Report states that Lunde paced around the cell and demanded to be sent to Peachford, a mental health facility in Atlanta. Doc. No. [104-5], p. 3.

Lunde can be heard on the video (simultaneously recorded of the RRT encounter), when asked his name "my name is I want to get the hell out of here."[41]

Per Plaintiffs, Devin Lunde was simply walking around the holding cell and looking out the cell window when the RRT rushed in, shot him with a taser, and slammed his head to the concrete before throwing him—while unconscious—into a restraint chair. Doc. No. [130], pp. 8–9;(Lunde Aff. ¶¶4-5, 9).

Lunde recalls being struck by the PepperBall,[42] but does not recall feeling the Taser, which was also deployed.[43]

At the end of the video, the nurse assesses Lunde, taking his vitals and checking the restraints. Doc. No. [95-2], ¶ 182. Lunde was placed in the restraint chair at approximately 6:55 p.m. and was removed at 11:01 p.m. and placed on a restraint bed. He was checked consistently during that time by jail staff and medical personnel. Id. at ¶ 183. For approximately thirteen minutes before being removed and placed in the bed, Sergeant Ross talked with him

---

**41.** Defendants state that Plaintiff Lunde also said: "What do I have to do break my fucking hand off, to show you that I'm nuts?" Plaintiffs argue that the latter part of what Lunde said is not clear [Doc. No. 130-8], ¶ 177. The Court reviewed the video (Doc. No. [114]) with a VLC media player. The Court is only able to resolve this dispute of fact in part, as the Court heard Plaintiff say, "What do I have to do break my fucking hand off to show you that . . . . ", but the Court is unable to discern the last words of the sentence.

**42.** Plaintiffs state that "there is some confusion about whether the projectiles that struck

[Lunde] were Pepperball or taser, and in what order." Doc. No. [130-8], p. 20. The Court does not deem it necessary to resolve this confusion for purposes of the present Summary Judgment Order.

**43.** The Use of Force Report states that "[d]ue to Lunde's irrational and aggressive behavior, the SA-200 launder and X-26 Taser were utilized on the entry . . . .Lunde had three (3) signature marks . . . . Two were from the Taser prongs, in his right shoulder and abdomen. The third was caused by the SA-200 and it was in his upper abdomen." Doc. No. [104-5], p. 3.

about his condition. Id. at ¶ 184. Lunde remained in the restraint bed for approximately eight hours. Id. at ¶ 185.[44] The placement of Lunde in the restraint chair was reviewed by the chain of command and found to be within policy. Id. at ¶ 186.

In this case, considering all the factors and the above-stated standard, Plaintiffs' evidence fails to show that the force used by Defendants' subordinates was objectively unreasonable.[45] The Court finds that there was a legitimate need for the application of force based on Sergeant Ross's determination that Lunde's hitting the wall and partition created a risk of self-harm, as well as Lunde's statement about breaking his hand off.[46]

As to the relationship factor (i.e., the relationship between the need and the amount of force that was used), as in the case of Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir.1991), the Court concludes that "[t]he four-point restraints were used to reduce or eliminate [Anisko's] ability to inflict physical harm against ... himself ...."

As to the injury factor (i.e., the extent of injury inflicted upon Lunde), the Court finds that, while there is evidence that there were impact marks from the distraction device and signature marks from the Taser prongs, there is no evidence of serious or permanent injury. In addition, while Plaintiffs argue that he was rendered unconscious by the RRT and Defendants in contrast argue that Lunde's body merely appears to go limp (Doc. No. [95-1], p. 18 n.2.), to the extent that this was an injury, it also does not appear to be permanent or serious.

In regard to the severity factor (i.e., any efforts made to temper the severity of the forceful response), the Court concludes that the evidence shows that a nurse immediately checked Lunde upon his being secured in the restraint chair. Doc. No. [104-5], p. 3. He was also regularly monitored for the four hours and six minutes that he remained in the chair.[47] Doc. No. [104-1], p. 1.

On the whole, the evidence here shows that each Plaintiff's placement in the restraint chair was applied in an objectively reasonable good faith effort to prevent Plaintiffs from inflicting self-harm. Slaughter, 2007 WL 2908648, at 11 (using "good faith" language in a pretrial detainee context). In the absence of evidence that these Defendants (and their subordinates) acted in an objectively unreasonable manner, the use of force at issue, here, did not violate the Fourteenth Amendment.[48] Plaintiffs

44. As noted by Defendants, Plaintiff Lunde has not made a claim regarding his placement in the restraint bed. Doc. No. [95-1], p. 17 n.1.

45. Supra, at nn.33, 34.

46. Plaintiff Lunde raises arguments identical to Plaintiff Shuford, concerning the threat having dissipated by the time the force was used by the RRT; however, the Court is unable to uphold Lunde's arguments based on its holding as to Plaintiff Shuford.

47. Prior to concluding the analysis as to Lunde, the Court addresses Plaintiffs' argument that Lieutenant Cofer (a former RRT Commander) testified that he had seen a crime committed after viewing the Lunde vid-

eo. Doc. No. [130], p. 9. Defendants deny that Cofer characterized the Lunde incident as a crime. Doc. No. [151], ¶ 14. The Court concludes that in viewing Lieutenant Cofer's statement in a light most favorable to the Plaintiffs, Lieutenant Cofer's statement is a subjective view about the excessiveness of the force, which is error to consider in determining the objective reasonableness of the force used. See Kingsley, 135 S.Ct. at 2477 ("these features suggested the jury should weigh respondents' subjective reasons for using force and subjective views about the excessiveness of the force. As we have just held, that was error.".).

48. The fact that the RRT may at one point have had a training slogan of "Execute with

have accordingly, failed to show a constitutional violation and the Defendants are entitled to qualified immunity and summary judgment in their favor. Id.[49]

### v. Duration of the restraint

Plaintiffs' Complaint also contains references to a custom, practice, or policy of "prolonged continuous restraint" of inmates in the restraint chair. Doc. No. [69], ¶ 58; see also Doc. No. [130], p. 7, ¶ g; p. 12 ("By approving use of force reports and videos that document four hours in the restraint chair in virtually every case,[50] Defendants are causing excessive force to be applied through the use of prolonged restraint whether it is up to the RRT or someone else to remove the inmate at the end of the four-hour period.").

In addition to the Supreme Court's admonition in Kingsley to give deference to the practices that in the judgment of jail officials are needed to preserve internal order/discipline/security, the Eleventh Circuit has recognized that "[a]lthough a Fourteenth Amendment violation could occur if prison officers continue to use force

after the necessity for the coercive action has ceased," in reviewing arguments such as these, courts are required "to show great latitude to the discretion of prison officials in inmate management." Williams, 943 F.2d at 1576–77 (some citations omitted).

In showing great latitude to the discretion of the jail officials, the Court finds that Plaintiffs' evidence and arguments concerning prolonged restraint are insufficient to show excessive force. In essence, in reviewing the restraint chair log of each Plaintiff, there are periods of quiet and periods of yelling (as for Lunde, there are also periods of shaking the restraint chair). The Court gives great latitude to the Defendants (and their subordinates) as to their discretion as to how long each plaintiff remained in the restraint chair. Cf. Scroggins v. Davis, 346 Fed.Appx. 504, 506 (11th Cir.2009) (unpublished opinion) ("[t]he Constitution does not require prison officials to release from restraint a dangerous inmate who has lashed out at them simply because he has stopped lashing out for the time being. Indeed, given that four-

extreme violence," "Fuck Randy Travis" (the news reporter who aired a series of stores about the RRT) and "They hate us because we are beautiful—Lieutenant Colonel Carl Sims" (Doc. No. [130], p. 14) is not determinative, because it does not establish that the RRT officers who executed force against Plaintiffs bought in or adhered to these slogans. Plus, the Supreme Court's new Kingsley opinion, indicates that it is error to suggest that a jury should weigh the officer's subjective reasons for using force and subjective views about the excessiveness of the force. 135 S.Ct. at 2477.

49. To this regard, Plaintiffs' citation of authority, based on non-binding Eleventh Circuit authority is also distinguishable and not determinative of this Court's decision. See Doc. No. [130], p. 23 (citing Williams v. Benjamin, 77 F.3d 756 (4th Cir.1996) (prolonged restraint beyond point of necessity supported inference that jail officials were acting to punish, not to quell a disturbance); Zimmerman v. Schaeffer, 654 F.Supp.2d 226 (M.D.Pa.

2009) (jury could find that use of restraint chair in response to minor disturbances was malicious and for purpose of causing harm); and Blackmon v. Sutton, 734 F.3d 1237 (10th Cir.2013) (finding a fact question where the inmate "was placed in the chair because of a legitimate threat of self-harm but then arguably kept there for extensive periods after any threat of self-harm had dissipated."). In the case sub judice, there is evidence in the record that the threat of self-harm had not dissipated at the time of the restraint. In addition, as stated above, the Court gives great latitude to the discretion of prison officials in the area of inmate management and length of time to restrain an inmate.

50. Only two of the Plaintiffs were in the restraint chair for four hours or more: DeJesus (4 hours, 7 minutes) Lunde (4 hours, 6 minutes). Anisko was in the chair for 3 hours and 30 minutes. Shuford was in the chair for 3 hours and 40 minutes.

point restraints make it difficult for an inmate to engage in any kind of physical misbehavior, [plaintiff's] position would mean that four-point restraints could never be continued for longer than a few minutes at a time. We know ... that is not the law.").

### b. whether the right at issue was clearly established at the time of the Defendants' alleged misconduct

■ In Kingsley, the Supreme Court held that "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" 135 S.Ct. at 2474.[51] Under this standard, "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he

was violating it, meaning that existing precedent ... placed the statutory or constitutional question beyond debate." City & Cty. of San Francisco, Cal. v. Sheehan, —— U.S. ——, 135 S.Ct. 1765, 1774, 191 L.Ed.2d 856 (2015) (citations, internal quotation marks omitted). "To address this question, the Supreme Court has instructed ... that [the reviewing court] must define the right in question with a sufficient degree of particularity." Kingsley v. Hendrickson, 801 F.3d 828, 832 (7th Cir. 2015) (citing Sheehan, 135 S.Ct. at 1775–76 ("We have repeatedly told courts ... not to define clearly established law at a high level of generality.").[52]

In the case. sub judice, Plaintiffs at times appear to define the constitutional right in a generality, i.e., as it being unconstitutional to use punitive or gratuitous force against an inmate who is not posing an immediate threat.[53] Doc. No. [190], pp. 2–3.[54] Plaintiffs also provide citations of authority in support of their argument.

---

**51.** In the Court's prior order (Doc. No. [166], p. 51), the Court interpreted Eleventh Circuit authority as appearing that the Fourteenth Amendment analysis stopped at the first prong of the qualified immunity inquiry, i.e., examination of the constitutional violation; however, Kingsley makes it clear that the Court moves to the second prong of the qualified immunity inquiry and determines whether the law was clearly established.

**52.** Plaintiffs argue that it is a jury question as to whether the law in the Eleventh Circuit "gave detention officers fair warning that it was unconstitutional to use punitive or gratuitous force against inmates not posing an immediate threat ...." Doc. No. [190], pp. 2–3. This Court does not understand Supreme Court and Eleventh Circuit authority to make this a jury question. See Cottrell v. Caldwell, 85 F.3d 1480, 1488 (11th Cir.1996) ("We do not mean to imply, of course, that district courts should submit the issue of whether a defendant is entitled to qualified immunity to the jury. Qualified immunity is a legal issue to be decided by the court, and the jury interrogatories should not even mention the term.").

**53.** In their Complaint, Plaintiffs set forth their clearly established argument, as follows "The

law was clearly established at all times herein that an inmate cannot be subjected to malicious and sadistic force (including prolonged unnecessary restraint) used solely for punitive or retaliatory purposes and not in a good faith effort to maintain order and discipline, and accordingly, Defendants are not entitled to qualified immunity for directing and encouraging the use of excessive force against Plaintiffs ... by the Rapid Response Team." Doc. No. [69], p. 23, ¶ 66. Plaintiffs further state in their Complaint: "The law was clearly established at all times herein that a supervisor such as the Defendants cannot be deliberately indifferent to the use of excessive force against inmates by subordinate officers, and accordingly, Defendants are not entitled to qualified immunity for purposes of supervisory liability under Section 1983." Doc. No. [69], p. 24, ¶ 71.

**54.** Plaintiff defines the right in other areas of their brief as follows: officers cannot use force against unruly inmates after their resistance has subsided (Doc. No. [190], p. 5.) and the right of an inmate to be free from excessive force and abuse while in custody (Doc. No. [130], p. 8). Plaintiffs argue that "the supervisors sued in this case should have known that

Doc. No. [190], p. 4. Plaintiffs cite the following Eleventh Circuit authority: "Once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments." Williams v. Burton, 943 F.2d 1572, 1579 (11th Cir. 1991).[55]

Since the Supreme Court recently set forth new law in Kingsley, the simple answer to this inquiry seems to be that in light of the Supreme Court's holding in Kingsley (2015), the law was not clearly established in 2013 when these Plaintiffs were incarcerated in the Gwinnett County Jail. However, Plaintiffs appear to argue that this Court should not find that because the law changed (through the Kingsley opinion), that the law could not have been clearly established. Doc. No. [190], p. 3. Plaintiffs state that "it is clear that Kingsley did nothing to change the standard of conduct for detention officers; it merely changed the elements that a plaintiff must prove in order to recover for a violation of that standard. Id. at p. 5. In addition on remand of the Kingsley case, the Seventh Circuit held that "before and after the Supreme Court's decision in [Kingsley], the standards for the amount of force that can be permissibly employed remain the same. " Kingsley, 801 F.3d at 832.

▮▮▮ After review, the Court agrees that it should not stop at Kingsley and conclude that the law was not clearly established. Yet, the Court finds that more specificity is needed in defining the right than Plaintiffs have provided. According to Defendants, the right should be defined and considered as follows "[t]here is no case that provides that properly training an RRT unit to do a cell entry and then put an inmate in a restraint chair in a manner that prevents both the officer and the inmate from being harmed is an excess use of force such that it violates a person's constitutional rights." Doc. No. [94-1], p. 26. Defendants further state that "relevant precedent lends itself to a conclusion ... [that] actually supports the use of the restraint chair when the officer is faced with an inmate exhibiting self-harming behavior." Doc. No. [149], p. 5 (citing Campbell v. Sikes, 169 F.3d 1353, 1374–77 (11th Cir. 1999) (use of "L" shaped restraint and straightjacket was permissible use of force on inmate who had taken affirmative acts towards harming herself and posed a serious threat of further self harm); Stanfill v. Talton, 851 F.Supp.2d 1346, 1371 (M.D.Ga. 2012) (inmate's self-harming behavior authorized use of force and placement in restraint chair); Slaughter v. Dooly Cty, 2007 WL 2908648 at *10 (M.D.Ga. Sept. 28, 2007) (need for force legitimate where plaintiff was placed in the restraint chair because she continued to strike the cell with her hands and feet and demonstrated a risk of self harm).").[56]

After review, this Court agrees with Defendants and holds that qualified immunity applies because these Defendants had no "fair and clear warning of what the Constitution requires." Sheehan, 135 S.Ct. at 1778.

---

it was unconstitutional to use brute force and prolonged restraint against inmates who were under control and not presently posing a threat." Doc. No. [130], p. 36.

**55.** See additional citations of authority, supra, n.25.

**56.** The Court recognizes that only the Eleventh Circuit case can be used to determine whether there was clearly established law, as "[i]n this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 827 n. 4 (11th Cir.1997).

## D. Eleventh Amendment

▮▮▮▮ Defendants state that to the extent Plaintiffs seek to hold them liable in their official capacities, they are entitled to immunity under the Eleventh Amendment.[57] Doc. Nos. [94-1], p. 26, [95-1], p. 31.

In response, Plaintiffs state that their individual claims for damages, which are presently before the Court, "have been brought against Defendants in their individual capacities only." Doc. No. [130], p. 38. However, their claim for injunctive relief is brought against Defendants in their individual and official capacities. Id. at p. 39. Plaintiffs argue that their class-wide request for injunctive relief against Defendants in their official capacity is not subject to Eleventh Amendment immunity. Id. at p. 37.

As Plaintiffs do not seek to hold Defendants liable in damages in their official capacities, there is no Eleventh Amendment immunity to apply and this portion of the Defendants' motion is moot. The Court will address the Plaintiffs' injunctive relief (individual and official capacities) arguments, *infra*.

## E. Injunctive Relief

Plaintiffs state that they have "pled a claim for injunctive relief only against Defendants in their official capacity, but that claim is brought on behalf of a class that has not yet been certified and is moot for purposes of this motion." Doc. No. [130], p. 25 n.6. "Plaintiffs ... request that consideration of this issue be postponed until resolution of the class certification issue, or, alternatively, that Plaintiffs be granted leave to amend to clarify their injunctive relief allegations whenever the Court deems appropriate." Id. at p. 40. "Plaintiffs agree that they are not individually entitled to injunctive relief because they are not presently inmates and it is unlikely that they will ever again be subjected to the use of excessive force by the RRT ...." Id. at p. 37.

Defendants argue that in the absence of any of Plaintiffs' claims surviving summary judgment, class-wide issues need not be reached. Doc. No. [149], p. 6. Defendants further state that Plaintiffs have no standing to seek injunctive relief and even if they had standing, they cannot meet the legal requirements for such relief. Doc. No. [95-1], p. 39.

After review, the Court agrees that after having determined that summary judgment is proper as to the named Plaintiffs' claims against Defendants, Plaintiffs have no standing to seek injunctive relief—and as to the class-wide issues, inclusive of Plaintiffs' request for injunctive relief, those issues need not be reached. Plaintiffs' request for postponing resolution of the injunctive relief issue and leave to amend to clarify their injunctive relief allegations is hereby denied.

## F. Plaintiffs' Objections to Defendants' Motions

Plaintiffs object to Defendants' motions, asserting the following technical deficiencies. Doc. No. [130], p. 5.

57. "The Eleventh Amendment provides immunity by restricting federal courts' judicial power ....The Eleventh Amendment protects a State from being sued in federal court without the State's consent." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir.2003). "It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued. To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State." Id. The Eleventh Circuit concluded that a sheriff is an arm of the State "in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard." Id. at 1328.

### 1. Page Limitations

Plaintiffs argue that Defendants have circumvented page limitations by utilizing the incorporation by reference method. Doc. No. [130], p. 5. After review, the Court is unable to conclude that the page limitations imposed by the March 21, 2014 order have been circumvented. The Court overrules Plaintiffs' objection.

### 2. Medical Records

Plaintiffs argue that their medical records were illegally obtained (in violation of the Health Insurance Portability and Accountability Act (HIPAA) and accordingly, Defendants should not be allowed to rely on the records. Doc. No. [130], p. 6. In response, Defendants state that the records at issue belong to the Gwinnett County Jail under the Service Provider Contract. Doc. No. [150], p. 3. Defendants further argue that there has been no improper disclosure, assuming the applicability of HIPAA on the ground that the records were filed under seal. Id. In light of the filing of the documents under seal, the Court agrees that there has been no improper disclosure of the documents at issue. Accordingly, Plaintiffs' objections are overruled.

### CONCLUSION

Defendant Carl Sims's Motion for Summary Judgment (Doc. No. [94]) and Defendants R.L. "Butch" Conway's and Don Pinkard's Motion for Summary Judgment (Doc. No. [95]) are hereby **GRANTED.**

Plaintiffs' technical deficiency objections to the Defendants' motions (Doc. No. [130], pp. 5-6) are hereby **OVERRULED.**

Plaintiffs' requests to postpone the resolution of the issue of injunctive relief and leave to amend to clarify their injunctive relief allegations are hereby **DENIED.**

The Clerk is hereby **DIRECTED** to enter judgment in favor of Defendants and **CLOSE** this case.

**IT IS SO ORDERED,** this 1st day of April, 2016.